[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 19, 2009
THOMAS K. KAHN
CLERK

No. 07-15991

D. C. Docket No. 06-02200-CV-SCB-TBM

PATRICK CHARLES HANNON,

                                        Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,

                                        Respondent-Appellee.

Appeal from the United States District Court
for the Middle District of Florida

(March 19,2009)

Before BIRCH, DUBINA and PRYOR, Circuit Judges.

DUBINA, Circuit Judge:

    In this death penalty case, we consider whether the Florida state courts

unreasonably applied clearly established federal law when they ruled that

petitioner, Patrick Hannon ("Hannon"), failed to demonstrate that his trial counsel's performance was inadequate during the penalty phase of his trial. The district court concluded that the state courts' resolution of Hannon's claim of ineffective assistance of penalty phase counsel was not unreasonable. We agree with the district court and conclude that the state court rulings were not objectively unreasonable. Accordingly, we affirm the district court's judgment denying Hannon federal habeas relief pursuant to 28 U.S.C. § 2254.

## I. BACKGROUND

A. *Facts*

The Supreme Court of Florida recited the facts of the crime as follows:

> Around Christmas 1990, Brandon Snider, a resident of Tampa, went to Indiana to visit relatives. While there, he went to the home of Toni Acker, a former girlfriend, and vandalized her bedroom. On January 9, 1991, Snider returned to Tampa.
>
> On January 10, 1991, Hannon, Ron Richardson, and Jim Acker went to the apartment where Snider and Robert Carter lived. Snider opened the door and was immediately attacked by Acker, who is Toni Acker's brother. Acker stabbed Snider multiple times. When Acker was finished, Hannon cut Snider's throat. During the attack, Snider's screams drew the attention of his neighbors. They also drew the attention of Carter, who was upstairs. Hearing the screams, Carter came downstairs and saw what was happening. He then went back upstairs and hid under his bed. Hannon and Acker followed Carter upstairs. Then Hannon shot Carter six times, killing him.

*Hannon v. State*, 638 So. 2d 39, 41 (Fla. 1994).

2

B. *Procedural History*

Several days into Hannon's trial, Ron Richardson ("Richardson"), an original co-defendant and alibi witness for Hannon, reached an agreement with the State. Richardson pled guilty to being an accessory after the fact and testified against Hannon. Richardson testified that when he, Hannon, and Acker left his house on the night of the murders, Hannon possessed his (Richardson's) firearm. Richardson testified that he saw Jim Acker stab Snider several times and that Snider's throat was not cut before Hannon approached Snider. He also stated that he saw Hannon go upstairs with a gun and that he heard shots. Richardson stated that after the murders, Hannon put clothes in a brown bag that he (Hannon) burned, and they threw the gun and knife in the river. Richardson also stated that Hannon told him that he (Hannon) shot Robert Carter ("Carter") and cut Snider's throat. (R. Ex. A–10, Vol. 10 at 1167–92.)

The jury found Hannon guilty of both murders and, after a penalty proceeding, unanimously recommended a death sentence. The trial court found the following aggravating circumstances applicable to both murders: (1) the previous conviction of a violent felony (the contemporaneous killings); (2) the murders were committed during the commission of a burglary; and (3) the murders were heinous, atrocious, or cruel. *See* Fla. Stat. § 921.141(5)(a), (d), (h) (1991).

3

As to victim Carter, the court found the additional aggravating factor that the murder was committed to avoid or prevent a lawful arrest. *See* Fla. Stat. § 921.141(5)(e) (1991). The trial court found no statutory mitigating circumstances, but did consider testimony from Hannon's parents and Toni Acker that Hannon was not a violent person and could not have committed the murders. The trial court also considered the fact that Hannon's original co-defendant, Richardson, was no longer facing a possible death sentence. The trial court concluded that the aggravating factors outweighed the mitigating factors and followed the jury's recommendation, imposing death sentences on Hannon for the murders of Snider and Carter. On direct appeal, the Supreme Court of Florida upheld Hannon's convictions and death sentences. *Hannon*, 638 So. 2d 39. The United States Supreme Court denied Hannon's petition for writ of *certiorari*. *Hannon v. Florida*, 513 U.S. 1158, 115 S. Ct. 1118 (1995).

In March 1997, Hannon filed a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850, presenting 34 claims for relief. Hannon later filed an amended motion to vacate judgment, presenting 21 claims. The trial court conducted a preliminary hearing and issued an order stating that it would conduct an evidentiary hearing on seven of Hannon's claims, one of which was his claim of ineffective assistance of penalty phase counsel. After conducting an

4

evidentiary hearing, the trial court issued an order denying Hannon post-conviction relief, and the Supreme Court of Florida affirmed. *See Hannon v. State*, 941 So. 2d 1109 (Fla. 2006).

Hannon then proceeded to federal district court where he filed a petition for writ of habeas corpus. The district court denied Hannon all relief and denied Hannon's motion to alter or amend the judgment and his motion for a certificate of appealability ("COA"). We granted Hannon's request for a COA on the sole issue of whether he received ineffective assistance of counsel at the penalty phase of his trial.

## II. ISSUE

Whether the district court erred in finding that the state courts' resolution of Hannon's claim of ineffective assistance of penalty phase counsel for failing to present sufficient mitigation evidence and mental health evidence was a reasonable application of clearly established federal law.

## III. STANDARD OF REVIEW

"When examining a district court's denial of a § 2254 habeas petition, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error." *Grossman v. McDonough*, 466 F.3d 1325, 1335 (11th Cir. 2006) (citation omitted). We review *de novo* a claim of ineffective assistance of

5

counsel. *Williams v. Allen*, 542 F.3d 1326, 1336 (11th Cir. 2008), *petition for cert. filed*, 2009 WL 379109 (U.S. Feb. 11, 2009) (No. 08-1032).

Hannon's habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), which establishes a "general framework of substantial deference" to review every issue the state courts have decided. *Diaz v. Sec'y for the Dep't of Corr.*, 402 F.3d 1136, 1141 (11th Cir. 2005). Pursuant to AEDPA, a federal court may not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the state court's judgment

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2006). A state court decision is "contrary to" clearly established federal law where the state court either applied a rule in contradiction to governing Supreme Court case law or arrived at a result divergent from Supreme Court precedent despite materially indistinguishable facts. *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006). Under the "unreasonable application" clause, a federal court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

6

unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000).

"Significantly, AEDPA codifies a presumption that the factual findings of state courts are correct, which may be rebutted only by clear and convincing evidence." *Dill v. Allen*, 488 F.3d 1344, 1354 (11th Cir. 2007) (citing 28 U.S.C. § 2254(e)(1)), *cert. denied*, 128 S. Ct. 651 (2007). This presumption applies to fact findings made by both state trial courts and state appellate courts. *Id.*

The legal principles governing a claim of ineffective assistance of counsel are well defined in our jurisprudence. "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2052 (1984)). "The standard we apply in assessing the first prong is that of a reasonable attorney, not a paragon of the bar." *Dill*, 488 F.3d at 1354. There is a strong presumption that counsel's performance is reasonable, and to rebut that strong presumption, Hannon "'must establish that no competent counsel would have taken the action that his counsel did take.'" *See Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc)). To establish the

prejudice prong, Hannon must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984).

## IV. DISCUSSION

On appeal, Hannon contends that the district court erred in its finding that the state courts' resolution of his claim of ineffective assistance of penalty phase counsel was reasonable. Hannon claims that the record evidence demonstrates that his trial counsel did not conduct a reasonable investigation into mitigation evidence, as instructed in *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, and *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495. Hannon maintains that contrary to the state courts' finding, his counsel's decision not to investigate any mitigation evidence was based on a complete misunderstanding of the law, not on a strategic decision. Not only was his counsel's performance deficient, but Hannon also contends that his counsel's deficient performance prejudiced his penalty proceeding. Hannon relies on the lay and expert testimony he presented at the state post-conviction evidentiary hearing that showed that Ron Richardson dominated Hannon, that Hannon had a history of chronic and severe drug and

8

alcohol abuse, that he was intoxicated at the time of the crimes, that he suffered from parental neglect, and that he had neurological impairments. Hannon asserts that if the jury had known of this mitigation and mental health evidence, there is a reasonable probability that the outcome of his sentence would have been different.

Both the state trial court and the Supreme Court of Florida addressed this particular claim of ineffective assistance of counsel. The state trial court stressed that Hannon's trial counsel, Joe Episcopo ("Episcopo"),[1] testified in the post-conviction hearing that his strategy was to not present any evidence in mitigation that would detract from Hannon's insistence that he was not present at the crime scene and that he did not commit the murders. The trial court referenced Episcopo's testimony that he did not investigate any possible drug or alcohol abuse because it did not relate to the alibi/innocence defense maintained by Hannon. The trial court also noted that Episcopo's strategy at the penalty phase was to show that Hannon did not have the type of character to commit the murders. (R. Ex. D–10 at 2020.)

In its review, the Supreme Court of Florida cited the governing ineffective assistance of counsel standard enunciated in *Strickland* and reinforced in *Wiggins*.

---

[1] Episcopo was a former prosecutor who had tried six death penalty eligible cases. His trial assistant was Norman Zambonie, who did some investigating and interviewing but did not make any pertinent decisions with regard to the case. *See* R. Ex. D-11, Vol. 11 at 2057-68.

The court then considered whether Episcopo's particular decision in this case not to investigate and develop more mitigation evidence was reasonable under the circumstances. The court concluded that based on the record in this case, trial counsel Episcopo "had specific tactical and calculated reasons for the strategy adopted." *Hannon*, 941 So. 2d at 1126. The court elaborated on its finding.

> At the postconviction evidentiary hearing, trial counsel testified that Hannon, as well as Hannon's parents, adamantly maintained Hannon's innocence throughout the guilt and penalty phases. Trial counsel therefore decided to focus on obtaining an acquittal during the guilt phase, arguing that Hannon was totally innocent and not present at the crime scene, and then only if necessary proceed to establish during the penalty phase that Hannon did not have the type of character to commit such murders. Trial counsel testified that Hannon assisted in every aspect of his defense, including testifying in his own defense during the guilt phase, and agreed to continue with the presentation of the innocence theme defense during the penalty phase, even after he was convicted. Trial counsel stated that he explained mitigation to Hannon and advised Hannon that he could change his position and admit his involvement in the murders during the penalty phase, but Hannon said he did not wish to do so.

> Trial counsel further testified that he had discussions with Hannon's parents and his sister Moreen, and he sought their input with regard to Hannon's defense. According to counsel, Hannon's parents and Moreen also agreed with a penalty phase strategy of character and to continue maintaining Hannon's innocence. Trial counsel stated that Hannon's parents "continued to believe their son did not and could not do this." . . . [C]ounsel's adoption of a strategy that focused on Hannon's character was the product of discussions with not only Hannon, but with his most intimate family members. According to counsel, Hannon and his family agreed not to pursue a strategy where, after proceeding during the guilt phase on the theory

10

that Hannon was not present at the time of the murders, Hannon at the penalty phase would suddenly admit he committed the crimes and begin offering evidence in mitigation of the murders. Counsel stated that he, Hannon, and his family "decided that [changing tactics] wasn't what it was going to be because Mr. Hannon was adamant. I can't tell you how much he was adamant he wasn't there." Neither Hannon nor any of his family members suggested any mitigation matters for the penalty phase. Rather, Hannon, his parents, and his sister consistently urged the strategy that counsel ultimately adopted and pursued; that is, "keep[ing] a consistent defense and a consistent position."

Trial counsel further testified that he was fully aware that lingering doubt was not a statutory mitigator. However, trial counsel stated that providing evidence during the penalty phase that Hannon did not have the type of character to commit the murders, and continuing to support the underlying innocence defense, had a real and practical jury effect that would mitigate in favor of the jury sparing Hannon's life. It was the character and demeanor of Hannon that trial counsel advanced in a very practical way. Even an expert in capital cases presented by Hannon during the postconviction evidentiary hearing admitted that the consistent approach had a practical and real impact factor in the juror's vote in terms of whether to vote for life imprisonment, notwithstanding that lingering doubt is not a recognized and valid statutory mitigating factor.

The record supports trial counsel's postconviction testimony that a defense based on the notions that Hannon did not commit the murders and was not even the type of person who could have committed the murders was developed from the beginning of trial. Even during the guilt phase, trial counsel presented Rusty Horn and Paul Kilgore to show that Hannon did not have the type of character to commit the murders and moved all of their guilt phase testimony into evidence during the penalty phase. Horn, Hannon's roommate and supervisor at his stucco job, described Hannon as a "teddy bear" type who had a reputation for nonviolence. Kilgore, another of Hannon's roommates, testified that Hannon was a nice person. Trial

11

counsel decided it was not necessary, and likely would not have made any difference, to recall Horn and Kilgore during the penalty phase to reiterate that to which they had already testified. The record also demonstrates that trial counsel presented mitigation during the guilt phase through Hannon, who testified that he attended high school through the eleventh grade; wanted to work, earn money, and learn a trade; was a hard worker; obtained a job with Rusty Horn where he received an extra fifty cents an hour if he did not drink; worked at a gas station; delivered auto parts and pizza; and visited his sister's house on Christmas and celebrated with his nieces and nephews.

Trial counsel presented further evidence that Hannon did not have the type of character to commit these murders through the penalty phase testimony of Toni Acker and Hannon's mother and father. . . . The record supports trial counsel's postconviction evidentiary hearing testimony that his penalty phase strategy was to establish that Hannon did not have the type of character to commit the murders.

*Hannon*, 941 So. 2d at 1126–28 (internal citations and footnotes omitted).

The Supreme Court of Florida emphasized that trial counsel's primary goal was to convince the jury that Hannon was not at the crime scene and was not the type of person to commit these murders. Trial counsel attempted to sway the jury's recommendation in favor of life over death, and his strategy throughout trial was to emphasize Hannon's good character. *See id.* at 1129. The court distinguished Hannon's case from *Wiggins* and *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456 (2005), and concluded that neither of these cases compelled a different conclusion because "[u]nlike *Wiggins*, in the instant case there were no

12

reports containing evidence of Hannon's life history which should have prompted trial counsel to conduct a deeper investigation into Hannon's background." *Id.* at 1133. The court also noted that trial counsel testified that neither Hannon, his father, his mother, nor his sister Moreen ever mentioned that Hannon had a traumatic childhood, had been abused or neglected, had a substantial drug problem, or had some form of brain injury. *Id.* Furthermore, the court found that in this case, unlike *Rompilla*, there was no indication that the State planned to rely on particular material in aggravation that Episcopo did not obtain or review prior to the penalty phase trial. *Id.* Additionally, the court stressed that contrary to either *Wiggins* or *Rompilla*, "Hannon adamantly expressed his wish to proceed consistent with the innocence defense during the penalty phase." *Id.*

The Supreme Court of Florida concluded that "trial counsel's limited investigation into mitigation under the specific facts of the instant case, which was based on the express wishes of Hannon, was within the level of reasonable performance that is required by *Strickland* and *Wiggins*." *Id.* at 1134. The district court found the state courts' resolution of this issue to be reasonable, and we agree. Hannon cannot overcome the presumption of counsel's effectiveness nor can he show clear error in the state courts' finding that his trial counsel made a strategic decision regarding his investigation into mitigation evidence. *See*

13

*Fotopoulos v. Sec'y, Dep't of Corr.*, 516 F.3d 1229, 1233 (11th Cir. 2008) (noting that the federal court gives a presumption of correctness to the state court's factual determination whether counsel's actions were the product of a tactical or strategic decision), *cert. denied*, 129 S. Ct. 217 (2008).

The record indicates that neither Hannon, his mother, his father, nor his sister ever mentioned to Episcopo that Hannon might suffer from some form of brain injury, that Hannon was neglected at home, or that he had a substantial drug and alcohol problem. Episcopo testified that he asked Hannon's parents if they had any problems with Hannon during his childhood, and they responded in the negative. (R. Ex. D–11, Vol. 11 at 2120.) Episcopo also stated that Hannon gave him no indication that he (Hannon) suffered from any mental deficiency because he participated in every aspect of his case, and he was in agreement with the decisions made regarding his defense. (*Id.* at 2140.) Episcopo commented that Hannon never exhibited any problem in processing and applying new information, and he did not exhibit any difficulty in paying attention to his case. (*Id.* at 2150.) Thus, Episcopo had no indication that a mental health evaluation would have been helpful.

Episcopo further testified that he did not investigate any potential drug abuse problem because it was not pertinent to the innocence defense that he and

Hannon agreed to maintain throughout the guilt and penalty phases. (*Id.* at 2084, 2109–13.) As Episcopo stated, presenting testimony that Hannon might have had drug and alcohol problems that might have influenced him to commit the murders or hiring a mental health expert to discuss possible mental health mitigation to lessen his culpability would have been in total conflict with the penalty phase strategy of maintaining Hannon's innocence and showing that Hannon was a non-violent, hard-working, "teddy bear" type who would not have committed the crimes. Furthermore, Episcopo testified that he argued lingering doubt at sentencing as a "catch-all." (*Id.* at 2118.) In accordance with the alibi/innocence defense that Hannon adamantly maintained, Episcopo strategically presented evidence that Hannon was not the type of person to commit such heinous crimes.

At sentencing, Episcopo moved into consideration all the mitigation evidence submitted during the guilt phase, which included Hannon's proffer of innocence, his testimony regarding his work history and education, his roommates' testimony that he was a good person with a "teddy bear" personality, and his sister's testimony that he was dominated by Ron Richardson. In addition, Episcopo presented the testimony of Toni Acker, Barbara Hannon, and Charles Hannon, all of whom testified that Hannon could not have committed the crimes. We have noted in our circuit that this lingering doubt or residual doubt theory is

15

very effective in some cases. *See Parker v. Sec'y, Dep't of Corr.*, 331 F.3d 764, 787–88 (11th Cir. 2003) (noting that "[c]reating lingering or residual doubt over a defendant's guilt is not only a reasonable strategy, but is perhaps the most effective strategy to employ at sentencing" (internal quotation marks omitted)); *see also Blankenship v. Hall*, 542 F.3d 1253, 1280 (11th Cir. 2008) (finding pursuit of residual doubt "eminently reasonable"); *Stewart v. Dugger*, 877 F.2d 851, 856 (11th Cir. 1989) ("trial counsel made a strategic decision that in light of the atrocious nature of the offense, [the defendant's] only chance of avoiding the death penalty was if some seed of doubt, even if insufficient to constitute reasonable doubt, could be placed in the minds of the jury . . . . Trial counsel cannot be faulted for attempting to make the best of a bad situation."); *Johnson v. Wainwright*, 806 F.2d 1479, 1482 (11th Cir. 1986) (noting the impact a lingering doubt argument has on a jury).

Thus, the record supports the state courts' finding that Episcopo made a reasoned strategic decision to limit the investigation into mitigation and to argue lingering doubt. Neither *Strickland* nor *Wiggins* requires counsel to investigate certain areas of mitigation. Moreover, Hannon's reliance upon *Rompilla* is to no avail. *Rompilla* requires "reasonable efforts to obtain and review material counsel knows the prosecution will probably rely on as evidence of aggravation at the

16

sentencing phase of trial." 545 U.S. at 377, 125 S. Ct. at 2460. This directive does not require a particular level of investigation in every case. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Id.* at 383, 125 S. Ct. at 2463. Hannon fails to acknowledge any aggravation evidence offered by the State that Episcopo did not obtain prior to the sentencing. Therefore, the district court correctly found that the state courts' conclusion that Episcopo was not deficient is not contrary to nor an unreasonable application of Supreme Court precedent.

However, even assuming that Hannon's penalty phase counsel was deficient, Hannon cannot satisfy the prejudice prong of *Strickland*. In considering this prong, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069.

In sentencing Hannon to death, the trial court found three aggravating circumstances applicable to the murders of both Snider and Carter: (1) previous conviction of a violent felony; (2) the murders were committed during the commission of a burglary; and (3) the murders were heinous, atrocious, or cruel. As to victim Carter, the trial court found the additional aggravating factor that the

murder was committed to avoid or prevent a lawful arrest. In mitigation, the trial court considered Hannon's guilt-phase testimony that he was a hard worker and was not present at the commission of the crimes. The trial court also considered his roommates' testimony that Hannon was a "teddy bear," his parents' and sister's testimony that Hannon was not a violent person, and the fact that Richardson was no longer facing a possible death sentence.

The Supreme Court of Florida reweighed the evidence and determined that the additional mitigation evidence would not have changed the outcome of the sentence. *See Porter v. Att'y Gen., State of Florida*, 552 F.3d 1260, 1269 (11th Cir. 2008). Because we presume the findings of fact by the state court are correct, we consider whether the state court "unreasonably balance[d] the mitigating and aggravating factors." *Id.* at 1275. We will affirm the denial of Hannon's habeas petition if the Supreme Court of Florida's adjudication as to Hannon's penalty phase claims did not "result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . . or [did not] result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The Supreme Court of Florida found as follows:

At the evidentiary hearing, Hannon presented the testimony of Drs. Barry Crown, Faye Sulton, and Jonathan Lipman. Dr. Crown, an expert in clinical and forensic psychology and neuropsychology as well as substance abuse, testified that he performed a neuropsychological evaluation of Hannon and had reviewed background materials, as well as a cognitive test that had already been performed by Dr. Sulton. Dr. Crown testified that Hannon scored within normal limits on most of the tests that were administered and opined that Hannon's overall cognitive processing was "squarely within the heartland of what we would consider to be a typical person," but he demonstrated some difficulty with rapidly retrieving stored information and applying it to a new situation. Dr. Crown also testified that Hannon may have had some brain damage but he could *not* state that the brain damage in any way affected Hannon's behavior on the date of the crime because Dr. Crown had not been asked to consider or determine that in his evaluation.

Dr. Sulton, an expert in clinical psychology, testified that Hannon's thinking was *not* disturbed, nor was he having hallucinations or so deeply depressed that his thinking would be distorted. She opined that Hannon did not have any obvious major mental illness and that his behavior did not make much sense in light of his normal intelligence. She also testified that by January of 1991, Hannon had experienced many failures personally and professionally, worked several jobs, had been unsuccessful in the military, used vast amounts of illegal substances over a long period of time, and that his ability to function on a day-to-day basis, reason, use good judgment, and logically and sequentially plan activities were all compromised. She also testified that she found only nonstatutory mitigation through her interviews with family members and Hannon. These included areas of general parental neglect, lack of structure, and lack of discipline and guidance in his early environment; a childhood history of illness that interfered with his school life at a crucial time; extreme dependence on other people to assist him in basic living skills; dependence on Ron Richardson for employment and drugs; substance abuse over many years; extraordinary impulsivity at times and great lack of concentration; and an inability to formulate goal-directed

19

behavior and to live as an adult. Dr. Sulton further testified that Hannon's personality changes, impulsivity, irritability, difficulty with concentration, and paranoid thinking would have impacted his day-to-day life. Ultimately, Dr. Sulton testified that in her opinion Hannon was not incompetent to stand trial at any point, was not insane at the time of the incident, and was of average intelligence. Dr. Sulton agreed with Dr. Crown's overall picture of Hannon's *normalcy* with only some areas of deficit.

Dr. Lipman, a neuropharmacologist, testified that Hannon's degree of intoxication at the time of the offenses would not suggest to him that Hannon was unable to remember what occurred or would have rendered him unable to know what he was doing at the time of the crime. Dr. Lipman, however, admitted that he probably underestimated Hannon's drug burden at the time of the offense because he was not aware that Hannon had used cocaine the night of the crimes. Dr. Lipman basically agreed with the State's expert's conclusions, which included a polysubstance abuse diagnosis.

The State's expert, Dr. Merin, an expert in the fields of neuropsychology and forensic psychology, testified that he reviewed Drs. Sulton and Crown's testing and administered the Wechsler Adult Intelligence Scale III test to Hannon. Dr. Merin testified that he agreed with Dr. Crown's conclusions with the exception of Dr. Crown's finding of prefrontal lobe impairment. Dr. Merin explained the discrepancy was based on Dr. Crown using a shorter version of the Category Test. Dr. Merin testified that when he did the longer version of the test, three years after Dr. Crown, there was *no indication of any prefrontal lobe impairment.* Dr. Merin testified that he did not find any significant brain injury. Dr. Merin also opined that because Hannon was heavily into drugs and alcohol, he probably had destroyed some neurons in his brain, but not to the extent that it interfered with his ability to reason, to make decisions on his own behalf, to maintain goal-directed behavior, or to think logically. Dr. Merin further testified that he found no indication of any thought disorder or suggestion of psychosis or brain-related problems.

*Hannon*, 941 So. 2d at 1134–35 (footnote omitted).

We agree with the district court that the state court did not unreasonably apply *Strickland* when it weighed the factors and concluded that Hannon failed to establish prejudice from the alleged lack of investigation into mitigation evidence. The testimony failed to establish the existence of a mental health impairment, as alleged by Hannon. None of the experts was able to identify any significant brain damage, and there was contrary evidence presented by the experts. Further, no expert presented evidence to establish any nexus between Hannon's alleged mental impairment and his behavior and the crimes. In fact, Dr. Crown testified that he was not asked to assess Hannon's competency or to address whether his brain damage affected his behavior on the date of the crimes. (R. Ex. D–12, Vol. 12 at 2377.) Moreover, Dr. Sulton testified that Hannon was neither incompetent nor insane at the time of the murders. (*Id.* at 2423.)

Thus, the state court reasonably concluded that Hannon failed to demonstrate that if the mental health testimony presented during the post-conviction hearing had been presented at trial along with the other mitigation evidence that was presented during both the guilt and penalty phases of the trial there is a reasonable probability that the result of the proceeding would have been different, especially in light of the gruesome nature of the manner in which the

21

victims were murdered. The record demonstrates that Hannon grabbed Snider from behind and slit his throat with such force that he was almost decapitated. Prior to this, Acker stabbed Snider about 14 times, and Snider's screams could be heard throughout the apartment complex. At one point, Snider yelled for Carter to call 911 because his guts were hanging out. The record also demonstrates that Carter ran from his attackers and tried to hide under the bed, but was shot six times. Despite the number of gunshot wounds, Carter did not die instantaneously. Emergency personnel testified that when they arrived, Carter was still gasping for breath. *See Hannon*, 941 So. 2d at 1137. Accordingly, the district court did not err in finding the state courts' resolution of the prejudice prong of Hannon's claim of ineffective assistance of penalty phase counsel was not unreasonable.

## V. CONCLUSION

Based on a thorough review of the record, we agree with the district court that the state courts' denial of relief on Hannon's claim of ineffective assistance of penalty phase counsel was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Accordingly, we affirm the district court's judgment denying Hannon habeas relief on his claim of ineffective assistance of penalty phase counsel.

AFFIRMED.

22