PARIENTE, J., dissenting. Consistent with my previous dissents,[7]1 conclude that Hurst[8] should apply retroactively to Hannon’s sentence, and because Hannon’s jury never heard the substantial mitigation that could have been presented if his counsel had performed a reasonable investigation, I would not rely on the jury’s unanimous recommendation for death to conclude that the Hurst error is harmless beyond a reasonable doubt. See Kaczmar v. State, 228 So.3d 1, 16-17, 2017 WL 410214, *11 (Fla. Jan. 31, 2017) (Pariente, J,, concurring in part, dissenting in part). This Court has made clear that the death penalty “must be reserved only for defendants convicted of the most aggravated and least mitigated murders,” and I do not believe that a jury has properly determined that Hannon is among those defendants. Hurst v. State, 202 So.3d 40, 59-60 (Fla. 2016), cert. denied, — U.S. —, 137 S.Ct. 2161, 198 L.Ed.2d 246 (2017). L joined Justice Anstead’s dissenting opinion from this Court’s denial of Han-non’s initial postconviction appeal, arguing that Hannon was entitled to a new penalty phase due to counsel’s failure to properly investigate and present mitigation to the penalty phase jury, Hannon v. State (Hannon II), 941 So.2d 1109, 1166 (Fla. 2006) (Anstead, J., dissenting). As to Hannon’s counsel’s failure to investigate and present mitigation during the penalty phase, Justice Anstead made clear: Shockingly, the record reflects that Hannon’s counsel did no investigation for mitigation, and, in fact, initially- was not going to present any form of mitigation during the penalty phase, even a continuing claim of not guilty. Hannon’s counsel stated at the postconviction evi-dentiary hearing, “Well, we had nothing to mitigate. He was not guilty. He didn’t do it. That was it.” However, at the penalty phase the trial judge actually directed him to reconsider this irrational strategy; thereafter, Hannon’s counsel presented the evidence relating to the “my client is too nice to have done this” strategy. [[Image here]] Although Hannon’s counsel stated that he had asked Hannon’s family members if Hannon was “born with any problems” and the family members did not bring any mental health issues to his attention, the testimony of Hannon’s family members tells a different story. Hannon’s sister stated that Hannon’s counsel never asked her about his life before the murders, his drug and alcohol use, or his home life. She asserted, “I had actually tried to contact [Hannon’s counsel] on more than one occasion and he absolutely refused to listen to what I had to say or contribute. He did not want to talk to me at all. I never had a phone call returned.” She was also listed as a witness for the penalty phase by Hannon’s attorney but was never called during the penalty phase. Hannon’s attorney erroneously had her listed as living in a different state even though she lived in Florida. She stated at the evi-dentiary hearing, “[Hannon’s counsel] told me I had nothing to contribute and he didn’t need me for anything.” Id. at 1158-62 (emphasis added). As to the available mental mitigation that Hannon’s counsel failed to present, Justice Anstead explained that defense counsel, because of his failure to investigate, lacked knowledge of significant information pertaining to Hannon: [Counsel] did not know that Hannon began using drugs and alcohol at age eleven and had a history of using LSD on a regular basis at the age of fifteen, as well as crystal methamphetamine, hallucinogenic mushrooms, and crack cocaine, nor did he know that Hannon was paranoid when under the influence of drugs. He did not question Hannon’s parents concerning . Hannon’s . expulsion from school for smoking marijuana.- He did not know that Hannon’s daily alcohol consumption before the murders was half a case of beer and a fifth of. bourbon, and that on the night of the murders, Hannon drank almost, two cases of beer. Hannon’s sister testified at the evidentiary hearing that Hannon’s behavior was irritated and edgy leading up to the murders. He would drink excessively and use cocaine on a daily basis without sleeping at night. He also used acid a couple of times- a month. Id. at 1164 (footnote omitted). As to mitigation actually presented at the postcon-viction evidentiary hearing, Justice An-stead explained: The-evidence presented at Hannon’s evidentiary hearing • established that Hannon had a history of severe drug and alcohol abuse “to the point of blacking out and passing out,” parental neglect, and neurological impairments resulting -in poor impulse control and flawed decision-making. Drs. Crown and Sulton testified that Hannon’s impairments impacted . his daily functioning. Dr. Crown, board certified in neuropsy-chology, stated that Hannon was “having difficulty with cognitive processing” and that there was evidence of “head-trauma from accidents, from being-kicked, from falls.” He also testified, In terms of drug [e]ffects the greatest exposure to drugs and the greatest absorption level is in the fronto temporal area and actually the subcortical area, relating to the limbic system. And these are areas that are responsible’ for concentration, attention, control of impulsivity, understanding the long-term consequences of immediate behavior and processing immediate memory, and also it aids in restoring memory function: Dr. Crown also noted that Hannon suffered from rheumatic fevér at age seven; its impact on his health was severe and he missed months of schooling. Hannon also suffered various head injuries, including losing consciousness at football practice in the ninth grade, getting kicked in the head by a bull, being hit by scaffolding at work, and being involved in several car accidents. “[Rjapidly retrieving ... information and applying it in a new situation is extremely difficult for him, and that’s where he falls apart.” Hannon was distracted very easily and has “difficulties under stress, pressure, drugs, lack of sleep, in fully comprehending information and attending to tasks.” Drs. Crown and Sulton both performed the Wechsler Adult Intelligence Scale Revised, which resulted in a very low score on the subtest that is most indicative of brain damage. Also, Han-non told Dr. Sulton that he had gone AWOL from the military on three separate occasions. Dr. Sulton found several nonstatutory mitigators such as parental neglect, lack of structure, lack of discipline, lack of guidance in his childhood environment, and serious childhood illnesses. Dr. Sulton also termed him an “extreme follower” and found that Han-non had severe and chronic substahce abuse problems, was impulsive, lacked concentration, and had personality changes due to his' cocaine addiction. His score of global intelligence was average, but he scored an 8 out of 100 on the “digit symbol subtest” relating, to “the rate of speed with which he is capable of learning symbol relationships,” which could indicate a learning disability. Dr. Lipman, a neuropharmacologist, stated that Hannon would combine “smoking, drinking, taking acid and Quaaludes” as a teenager and this could have had a long-term effect on his brain, even before he moved on to crystal meth and cocaine. Even the State’s witness, Dr. Sidney Merin, agreed that Hannon had “a polysubstance abuse disorder.” Therefore, if he had performed an investigation, Hannon’s counsel could have presented substantial and persuasive testimony concerning Hannon’s mental health to establish a case of mitigation. Id. at 1166 (footnote omitted). Determining that the lack of mitigation entitled Hannon to a new penalty phase, Justice Anstead concluded: No material mitigation was supplied to the jury in Hannon’s penalty phase; instead Hannon’s counsel chose to continue arguing innocence, an argument the jury had emphatically already rejected. Hence, in the face of this default by counsel, the jury was left with no choice but to impose the death penalty. Absolutely no mitigation was presented on behalf of Hannon, thereby resulting in a breakdown of our adversarial system as discussed by the Supreme Court in Strickland [v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),] and Wiggins [v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003),] and which resulted in the defendant being deprived of a reliable penalty-phase proceeding. Having demonstrated both deficient performance and prejudice at the evi-dentiary-hearing below, Hannon should be entitled to a new sentencing proceeding in which he will be represented by competent counsel prepared to contest the State’s case for the death penalty by presenting the voluminous evidence of mitigation presented at the postconviction hearing. Id. at 1169-70. Although the majority in 2006 relied on Hannon’s family’s involvement in choosing to waive mitigation as a strategy, it is 'axiomatic that defendants, such as Hannon in this case, cannot intelligently waive mitigation unless counsel performs a proper investigation. See id. at 1160-61; see also Wiggins, 539 U.S. at 526, 123 S.Ct. 2527; State v. Pearce, 994 So.2d 1094, 1102 (Fla. 2008). In addressing the appeals before us, it is difficult to ignore the testimony that could have been presented if Hannon’s counsel had properly conducted a mitigation investigation. The United States Supreme Court made clear in Wiggins that mitigation significantly affects a jury’s sentencing determination, stating: “We further find that had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.” 539 U.S. at 536, 123 S.Ct. 2527. Thus, Hannon’s counsel’s failure regarding mitigation is even more disturbing in light of Hurst. As I explained in Kaczmar: Under Hurst, this Court cannot substitute its judgment for that of the jury and, therefore, cannot determine what weight the additional mitigation would have been assigned if it had been presented to the penalty phase jury. Nor can we speculate on the effect that the additional mitigation, if presented to the jury, would have had on the jury’s recommendation in [the] penalty phase. 228 So.3d 1, 16, 2017 WL 410214, at *11 (Pariente, J., concurring in part and dissenting in part). Further, in Robards v. State, 214 So.3d 568 (Fla. 2017), I emphasized the constitutional ramifications of “woefulfiy] inadequate] ... penalty phase counsel.” Id. at 576 (Pariente, J., concurring). As in Robards, the jury in Hannon’s case “was not presented with the full picture of [his] life when it made its recommendations.” Id. at 576-77. Exacerbating counsel’s failure to present mitigation, which left the jury with. “no choice” but to recommend death at the penalty phase, Hannon II, 941 So.2d at 1169 (Anstead, J., dissenting), Hannon’s codefendant, Acker, was given a life sentence for his role in the crimes after this Court affirmed Hannon’s convictions and sentences on direct appeal. Id. at 1144 (per curiam). Denying Hannon’s newly discovered evidence claim on postconviction, this Court relied on its. conclusion on direct appeal—before Acker was retried—that Hannon was the “most culpable” of the two codefendants. Id. at 1145. However, as pointed out in Justice Anstead’s dissenting opinion, at Hannon’s postconviction eviden-tiary hearing “Dr. Sulton also termed [Hannon] an ‘extreme follower’, and found that Hannon had severe and chronic substance abuse problems, was impulsive, lacked concentration, and had personality changes due to his cocaine addiction.” Id. at 1169-70. (Anstead, J., dissenting). Hannon raised the issue of proportionality in his third successive postconviction motion and argues on appeal to this Court that his sentence violates the Eighth Amendment based on proportionality. Further, although not discussed in this Court’s opinion on direct appeal, it was Hannon’s codefendant who had the motivation to kill the targeted 'victim, who had vandalized the codefendant’s sister’s apartment- a week before. See Hannon I, 638 So.2d at 43. The Court, explained on direct appeal that “[t]he motive was the conflict between [the victim] and Jim Acker’s sister.” Id. at 44. Likewise, Hannon states in his brief to this Court that “Acker, was the instigator and had the only motive.” initial Br. of Appellant, Hannon v. State, No. SC17-1837 (Oct. 18, 2017), at 83. Hannon alleges that “Acker was.equally responsible for [the victim’s] cause of death, multiple stabbing wounds, where no single wound was singled out as being fatal but rather were all lethal.” Id. Hannon cites to the medical examiner’s testimony in both Hannon’s and Acker’s trials, stating that any one of the stab wounds inflicted by Acker on the victim would have been fatal. Id. at 71. Thus, it would appear that Acker had the motive to murder the victim and played a substantial role in the murder. Of course, had this Court granted Han-non a new penalty phase in 2006, as Justice Anstead advocated,[9] Hannon would now have the benefit of the retroactive application of Hurst’ and would be entitled to a new penalty phase in light of Hurst if the jury had not unanimously 'recommended death on resentencing. See Mosley v. State, 209 So.3d 1248, 1283 (Fla. 2016). While reaching this conclusion may require a lot of “ifs,” Hannon’s case demonstrates to me the inherent'arbitrariness of the imposition of the death penalty as to who lives and who dies, even among code-fendants. Hannon explains this arbitrariness in his Response to this Court’s -Order to -Show Cause, pointing to various defendants who werq convicted of older homicides and received the benefits of Hurst because they were granted resentencing. Response to Order to Show Cause, Hannon v. State, No. SC17-1618 (Oct. 12, 2017), at 12-17. And, as I stated in my concurring in part, dissenting in part opinion in Asay v. State (Asay V), 210 So.3d 1, 32-37 (Fla. 2016), cert. denied, No. 16-9033, — U.S. —, 138 S.Ct. 41, 198 L.Ed.2d 769, 2017 WL 1807588 (U.S. Aug. 24, 2017): The. majority’s conclusion results in an unintended, arbitrariness as to who receives relief depending on when the defendant was sentenced or, in some cases, resentenced. For example, many defendants whose crimes were committed before 2002 will receive the benefit of Hurst because they were previously granted a resentencing on other grounds and their newest death sentence was not final when Ring was decided. To avoid 'such arbitrariness and to ensure uniformity and fundamental fairness in Florida’s capital sentencing, our opinion in Hurst should be applied retroactively to all'death sentences. Id. at 36 (Pariente, J., concurring in part and dissenting in part) (footnote omitted). Hannon’s case demonstrates this arbitrariness. Finally, Hannon raised claims based on Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), in his initial postconviction motion and again after Hurst in his response to this Court’s Order to Show Cause at issue in this case. Hannon II, 941 So.2d at 1117, n.2; Response to Order to Show Cause, supra, at 11. He also raised this issue in his Renewed Motion to Stay Execution, noting Justice Sotomayor’s recent dissenting opinion in Truehill v. Florida, Nos. 16-9448, 17-5083, — U.S. —, 138 S.Ct. 3, 199 L.Ed.2d 272, 2017 WL 2463876 (U.S. Oct. 16, 2017), joined by Justices Ginsburg and Breyer. Per curiam op. at 16. Thus, Hannon has raised a valid Caldwell claim both before and after Hurst v. Florida, — U.S. —, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016), and Hurst. On the merits, I believe that the Caldwell claim further strengthens Hannon’s Eighth Amendment argument. Hannon’s Response to this Court’s Order to Show Cause explains the flaw in the jury instructions used in his pre-Hurst penalty phase that diminish the jury’s sense of responsibility: If a bias in favor of a death recommendation increases when the jury’s sense of responsibility is diminished, removing the basis for that bias increases the likelihood that one or more jurors will vote for a life sentence. Here, the record in Mr. Hannon’s case supports that presumption where his jury received inaccurate instructions as to their ultimate responsibility during sentencing and as to their power and to dispense mercy and preclude a death sentence.... This [Court’s, holding in Hurst] is particularly relevant ,in Mr. Hannon’s case where he has argued during his posteonviction appeals that the jury was not. instructed it could exercise mercy and residual doubt was the only argument trial counsel advanced to the jury during [the] penalty phase. Response to Order to Show Cause, supra, at 22-23. Thus, this claim further supports the conclusion I explained above—that the jury in Hannon’s case was not properly informed or instructed to. determine, as constitutionally required by Hurst, that Hannon is deserving of the ultimate punishment because he committed murders that are among “the most aggravated and least mitigated.” Hurst, 202 So.3d at 60. CONCLUSION In recommending between life and death in Hannon’s case, the jury was denied access to “voluminous evidence of mitigation.” Hannon II, 941 So.2d at 1169 (Anstead, J., dissenting). Also, Hannon’s code-fendant, who had personal motivation to commit the crime and first attacked the targeted victim, received a life sentence of which this Court was unaware when it affirmed Hannon’s sentences on direct appeal. For all these reasons, I dissent from denying Hannon relief from his pending death warrant. . See Lambrix v. State, 227 So.3d 112, 114—15, 2017 WL 4320637, *2-3 (Fla. Sept. 29, 2017) (Pariente, J., dissenting), cert. denied, Nos. 17-6222, 17A375, — U.S. -, 138 S.Ct. 312, 199 L.Ed.2d 202, 2017 WL 4409398 (U.S. Oct. 5, 2017); Asay v. State (Asay VI), 224 So.3d 695, 703-09 (Fla. 2017) (Pariente, J., dissenting); Hitchcock v. State, 226 So.3d 216, 220, 2017 WL 3431500, *3 (Fla. Aug. 10, 2017) (Pariente, J., dissenting), petition for cert. filed, No. 17-6180 (U.S. Sept. 29, 2017); Asay v. State (Asay V), 210 So.3d 1, 32-37 (Fla. 2016) (Pariente, J., concurring in part, dissenting in part), cert. denied, No. 16-9033, — U.S. -, 138 S.Ct. 41, 198 L.Ed.2d 769, 2017 WL 1807588 (U.S. Aug. 24, 2017), I note that this is not a case in which the defendant, before Hurst, waived the right to a penalty phase jury or the right to present mitigation altogether, Kaczmar v. State, 42 Fla. L. Weekly S127, — So.3d - (Fla. Jan. 31, 2017) (mitigation waiver); Mullens v. State, 197 So.3d 16 (Fla. 2016) (penalty phase jury waiver), cert. denied, — U.S. —, 137 S.Ct. 672, 196 L.Ed.2d 557 (2017). . Hurst v. State, 202 So.3d 40, 59-60 (Fla. 2016), cert. denied, — U.S. —, 137 S.Ct. 2161, 198 L.Ed.2d 246 (2017), . I recognize that the United States Court of Appeals for the Eleventh Circuit also denied relief on Hannon’s claim that “counsel’s performance was inadequate during the penalty phase of his trial,” finding that our opinion was not “objectively unreasonable.” Hannon v. Sec'y, Dep’t of Corr., 562 F.3d 1146, 1148 (11th Cir. 2009). However, the federal standard for granting relief on a claim that the state courts denied is extremely narrow./