994 So.2d 1094 (2008)
STATE of Florida, Appellant,
v.
Faunce Levon PEARCE, Appellee.
No. SC07-201.
Supreme Court of Florida.
November 13, 2008.
*1096 Bill McCollum, Attorney General, Tallahassee, FL, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellant.
Bill Jennings, Capital Collateral Regional Counsel, and Richard E. Kiley and James Viggiano, Jr., CCRC Staff Attorneys, Middle Region, Tampa, FL, for Appellee.
PER CURIAM.
This case is before the Court on appeal from an order granting a motion to vacate a conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from a capital conviction for which a sentence of death was imposed, this Court has jurisdiction of the appeal under article V, section 3(b)(1), Florida Constitution. For the reasons expressed below, we affirm the trial court's order granting the defendant a new penalty phase but reverse that portion of the order granting him a new trial based on ineffective assistance of counsel.

FACTS AND PROCEDURAL HISTORY
Faunce Levon Pearce was convicted of first-degree murder with a firearm and attempted second-degree murder with a firearm. Pearce was sentenced to death. This Court affirmed the convictions and death sentence on direct appeal. See Pearce v. State, 880 So.2d 561, 577 (Fla. 2004).[1] The following is a summary of the *1097 facts that were revealed at Pearce's trial. See id. at 565-67. On the evening of September 13, 1999, Faunce Levon Pearce visited Bryon Loucks at Loucks's home. Pearce was looking for Loucks's teenage stepson, Ken Shook, in order to obtain LSD (lysergic acid diethylamide) geltabs. After finding a source for the geltabs, Tanja Barcomb, Pearce gave Robert Crawford, Stephen Tuttle, and Amanda Havner $1200 to obtain a book of 1000 geltabs. At that time, Pearce indicated that they should not return without either the money or the drugs. Soon thereafter, Shook, Tuttle, Crawford, and Havner went to Barcomb's house. Once there, Barcomb indicated that she, her boyfriend, and Havner would get the drugs from a supplier while the three boys remained behind. However, after arriving at an apartment complex, Barcomb told Havner to stay in the car. Barcomb and her boyfriend entered a friend's apartment. While in the apartment, the boyfriend hid the money in his shoe and punched himself in the face. After returning to the car, Barcomb and her boyfriend told Havner that their drug supplier stole the money. Shook, Tuttle, Crawford, and Havner were forced to return to Loucks's business without the money or the drugs.
Before the teenagers returned to Loucks's business, Pearce and Loucks received a telephone call from Barcomb explaining that Pearce's money had been stolen. Pearce became very angry. When the four teenagers returned shortly thereafter, Pearce was standing outside with a gun visibly tucked in his pants. When the teenagers exited the car, Pearce waved the gun and ordered them inside Loucks's business office. Pearce confined Loucks and the four teenagers inside the business office for an unknown period of time. During this confinement, Pearce refused to allow anyone to leave and, at various times, Pearce waved his gun at the confined individuals. At one point, Pearce took Tuttle outside and forced him at gunpoint to perform oral sex upon him.
Pearce called his friend Theodore Butterfield and requested that Butterfield come to Loucks's business armed and bring Lawrence Joey Smith with him. Heath Brittingham, who was at the house with Butterfield, accompanied Butterfield and Smith. When the three men arrived at Loucks's business, they were visibly armed. Pearce informed the three men that Tuttle and Crawford would show them where to find the people who had stolen Pearce's money. At gunpoint, Pearce ordered Tuttle and Crawford to get in his car. Pearce, Smith, Butterfield, Brittingham, Tuttle, and Crawford left in Pearce's car.
After driving south on Highway 41 in Pasco County, Pearce turned right on State Road 54 to a dark, isolated area. Pearce stopped the car along the side of the road and told Tuttle to get out of the car. Smith and Tuttle exited the car. Pearce told Smith either to "break [Tuttle's] jaw" or "pop him in the jaw." Smith then turned around and shot Tuttle once in the back of the head. When Smith got back in the car, Pearce asked, "Is he dead?," and Smith replied, "Yeah, he's dead. I shot him in the head." Pearce then drove approximately two hundred yards down the road, stopped the car, and Smith exited the vehicle again. Pearce ordered Crawford out of the car. Crawford complied while pleading, "No. Please no." Smith shot Crawford in the head and in the arm. Tuttle survived the gunshot to his head, and he flagged down a passing *1098 motorist for assistance. Crawford, however, died at the scene.
On September 14, Smith was arrested. Pearce was located and arrested a few weeks later. Pearce was charged as a codefendant in the murder of Robert Crawford and in the attempted murder of Stephen Tuttle.[2] During the guilt phase of his trial, Pearce did not testify or present any evidence. Pearce was convicted of first-degree murder with a firearm for Crawford's death and attempted second-degree murder with a firearm for the shooting of Tuttle. See Pearce, 880 So.2d at 561, 567. Moreover, during the penalty phase of the trial, Pearce did not testify or present penalty phase argument. The jury recommended the death sentence by a vote of ten to two. See id.
During the Spencer[3] hearing, Pearce declined to present evidence or argument, and he refused to allow his attorneys to do so. While imposing sentence, the trial court considered a handwritten letter from Pearce; letters from family members of Crawford; a presentence investigation; and several hundred pages of court, criminal, school, and other records pertaining to Pearce. The trial court found three aggravating factors: a previous conviction of a violent felony, based on the attempted murder of Tuttle; the murder was committed while engaged in kidnapping; and the murder was cold, calculated, and premeditated without any pretense of moral or legal justification. The trial court found no statutory mitigating factors. While Pearce requested no nonstatutory factors, the trial court considered a number of factors based on claims in Pearce's correspondence to the court. However, the trial court concluded that Pearce's claims were actually claims of lingering doubt and would not be considered as mitigating factors. The trial court did find Pearce's good conduct in jail to be a mitigating factor, but only entitled to little weight. The trial court concluded that the aggravating factors far outweighed the mitigating factors and imposed a death sentence.
In September 2005, pursuant to Florida Rule of Criminal Procedure 3.851, Pearce filed a motion for postconviction relief in the Circuit Court of the Sixth Judicial Circuit.[4] An evidentiary hearing was held over several days between July and December of 2006. Following the evidentiary hearing, the trial court issued an order granting relief. The trial court vacated Pearce's judgments and sentences and ordered *1099 a new trial. The trial court concluded that Pearce satisfied the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), standard as to both the guilt and the penalty phases of his trial. In the instant appeal, the State challenges the trial court's grant of relief.

ANALYSIS

I. Standard of Review
In State v. Riechmann, 777 So.2d 342, 350 (Fla.2000), this Court summarized the standard of review:
Ineffective assistance of counsel claims present a mixed question of law and fact subject to plenary review based on the Strickland test. See Rose v. State, 675 So.2d 567, 571 (Fla.1996). This requires an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings.
If the trial court's findings are supported by competent substantial evidence, we will not substitute our judgment for that of the trial court on questions of fact, the credibility of the witnesses, and the weight to be given to the evidence by the trial court. See Blanco v. State, 702 So.2d 1250, 1252 (Fla. 1997) (quoting Demps v. State, 462 So.2d 1074, 1075 (Fla.1984)).
Following Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court held that in ineffective assistance of counsel claims two requirements must be satisfied: (1) the claimant must identify a particular act or omission of the lawyer that is outside the broad range of reasonably competent performance under prevailing professional standards, and (2) the clear, substantial deficiency shown must further be shown to have affected the fairness and reliability of the proceeding so that confidence in the outcome is undermined. See Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). As to the first prong, the defendant must establish that "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052; see also Cherry v. State, 659 So.2d 1069, 1072 (Fla.1995). There is a strong presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. See id. at 689, 104 S.Ct. 2052; see also Rivera v. Dugger, 629 So.2d 105, 107 (Fla.1993). For the second prong, the reviewing court must determine whether the deficiency affected the fairness and reliability of the proceeding so that confidence in the outcome is undermined. See Strickland, 466 U.S. at 695, 104 S.Ct. 2052. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687, 104 S.Ct. 2052.

II. Ineffective Assistance at Guilt Phase Trial
The State asserts that the trial court erred when it found that defense counsel rendered ineffective assistance in failing to file a motion in limine to exclude evidence that Pearce forced the attempted-murder victim to perform a sexual act and for failing to object during the State's opening, the State's closing, and the victim's testimony about the uncharged sexual battery. The trial court concluded that trial counsel's deficient performance prejudiced Pearce because the uncharged collateral crime improperly influenced the jury to return a verdict of guilty for murder and attempted murder. We need not address *1100 the deficiency prong because Pearce clearly has not shown prejudice. See, e.g., Pietri v. State, 885 So.2d 245, 256 (Fla. 2004) ("[A] court considering a claim of ineffectiveness of counsel `need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.'") (quoting Maxwell, 490 So.2d at 932).
During opening argument in the guilt phase of the trial, the prosecutor made the following comment about the uncharged sexual battery:
You're going to hear that the saga continues. Faunce Pearce, enraged as he is, calls for Teddy Butterfield and Lawrence Joey Smith and Heath Brittingham. But you're also going to hear that prior to him calling for them, he can't control his anger. He puts that.40-caliber pistol up to Steve Tuttle's head and takes him outside, tells him, "Get down on your knees." Steve Tuttle is telling him, "Please, don't do this to me. Please don't." And you're going to hear from the testimony of Stephen Tuttle that Faunce Pearce takes this.40-caliber pistol, puts it up to his temple, as he's down on his knees, and tells him, "You're either going to suck my fucking dick or I'm going to blow your fucking head off." And you're going to hear that as Stephen Tuttle was down on his knees, terrified for his life, he knew there was nothing he could do with this .40-caliber pistol to the side of his head, he did exactly what Faunce Pearce asked him to do, in fear of losing his life.
During the direct examination of Tuttle, Tuttle testified about the events of that day including the sexual act he was forced to perform.
Lastly, during closing argument in the guilt phase of the trial, the prosecutor made the following comment about the uncharged sexual battery:
The testimony from Steven Tuttle was that he couldn't go anywhere.
Why not?
Well, I wonder if it has anything to do with the fact that after she confronted him, Amanda had a cocked .40-caliber handgun put in her face. Apparently, that threat was believable enough to Mr. Loucks because he tried to break it up  did break it up. Told everybody to calm down.
How serious was the threat? How threatened did these folks feel? How threatened was Steve Tuttle? How afraid was he?
I'm going to say it once and I am not going back to it again. Steve Tuttle put the penis of Faunce Pearce in his mouth because he thought if he didn't, he would die.
Were they confined? Did they have a choice? How serious was the threat, and how deeply  how deeply  did they believe it?
To establish prejudice, Pearce must demonstrate that counsel's alleged deficient conduct affected the fairness and reliability of the proceeding so that confidence in the outcome is undermined. See Maxwell, 490 So.2d at 932. Pearce claims that the uncharged evidence of sexual battery prejudiced him because it poisoned the jury against him and distracted them from considering the evidence concerning the murder of Crawford. He also claims the verdict of guilt was the prejudice. We disagree. The sexual assault did not become the feature of the trial and was simply one act in a series that led to the murder and attempted murder. See, e.g., Smith v. State, 866 So.2d 51, 61 (Fla.2004) (noting that evidence of other crimes should not become the feature of the trial). Our confidence in the verdict is not undermined. See Strickland, 466 U.S. at 695, 104 S.Ct. 2052. It cannot be said that *1101 Pearce's conviction or death sentence resulted from a breakdown in the adversary process that rendered the verdict unreliable. See id. at 687, 104 S.Ct. 2052.
It is clear from the trial testimony that Pearce was the mastermind or dominating force behind the murder and attempted murder. All of the events that took place, including the sexual battery, occurred during one protracted criminal episode. Pearce gave the victims the money to purchase drugs. When they returned without the drugs or the money, Pearce became enraged. He began to terrorize the victims by displaying a gun, keeping them confined, threatening them with the gun, using the gun to force one victim to perform oral sex, and forcing the victims at gunpoint to get into a car. It was Pearce who summoned Smith to the scene, and it was Pearce who ordered Smith to shoot the victims. The sexual battery was but one part of a series of events designed to terrorize the teenagers. Accordingly, we find that the trial court erred in granting Pearce a new trial.

III. Ineffective Assistance at Penalty Phase Trial
The State asserts that the trial court erred in granting Pearce a new penalty phase based on the ineffective assistance of counsel because Pearce, as opposed to counsel, was responsible for the failure to present mitigation. Pearce asserts that his waiver of mitigation was invalid since trial counsel failed to investigate potential penalty phase mitigation and hence he could not knowingly, voluntarily, and intelligently waive the presentation of mitigation evidence. The trial court held an evidentiary hearing on this claim at which Pearce called numerous witnesses. In its final order, the trial court concluded that trial counsel failed to do anything to prepare for the penalty phase of the trial and that there was mitigation that counsel should have investigated and presented. These findings are supported by competent, substantial evidence.
Pearce's two trial attorneys testified at the hearing. Alfred Ivie was lead counsel. Since his representation of Pearce he has had a number of medical problems, which has made his ability to recall details significantly compromised. Mark Ware was appointed as co-counsel in the case. He was responsible for performing the penalty phase with Ivie's assistance. At the time of Pearce's trial, Ware had never done a capital case, never attended any death penalty seminars, and was not familiar with the ABA standards regarding investigations. Ivie was aware that Ware had never tried a capital case before, so he gave Ware a "Life over Death" book to familiarize himself on the type of things he would be doing during the penalty phase. However, Ware did not completely read the text on "Life over Death" or read any other text on the penalty phase. Counsel spent very little time readying for the penalty phase proceedings. In fact, Ware testified that he did not conduct any preparation for the penalty phase of the trial. Counsel did not obtain any medical, school, probation, or Department of Children and Family Services records.
Counsel never contacted any of Pearce's family members in an attempt to discover potential mitigation. At the evidentiary hearing, postconviction counsel demonstrated that the following information regarding Pearce was available if a reasonable investigation had been conducted: (1) during his marriage he had a loving relationship with his children; (2) growing up in their household there was a lot of discipline that consisted of getting "whoopings" with a belt or switch; (3) his ex-wife would physically abuse him; (4) he ran away from home as a child; (5) he engaged in temper tantrums and mood swings as a child; (6) his son was diagnosed with fetal alcohol syndrome; (7) his older brother *1102 was diagnosed with a bipolar disorder; (8) he was a drug user; and (9) he was involved in car accidents and demonstrated different behavior afterwards. The evidence presented also indicated that Pearce fell down the stairs as a baby, received head injuries when he fell out of a truck, and was diagnosed with dyslexia that he possibly received from a brain injury.
At the evidentiary hearing, defense counsel presented the testimony of Dr. Richard Carpenter, Dr. Henry Dee, and Dr. Robert Berland. Based on the records and his examination of Pearce, Dr. Carpenter, a licensed psychologist, could have testified to the following mitigating factors: (1) Pearce suffers from a bipolar disorder; (2) he is predominantly manic and goes for long periods of time in manic states; (3) he was a substance abuser; (4) he was operating under extreme emotional or psychological distress at the time of the offense; and (5) he is not an inherently violent person. Dr. Henry Dee, a licensed clinical psychologist and clinical neuropsychologist, also testified for the defense. After evaluating Pearce, Dr. Dee found that Pearce's impaired memory, increased impulsivity, and increased irritability indicated he has prefrontal lobe damage, a cerebral injury that is permanent. Dr. Dee administered four tests on Pearce: Wechsler Adult Intelligence Scale (WAIS), third edition; Denman Neuropsychology Memory Scale; Multilingual Aphasia Examination; and Wisconsin Card Sorting test. After conducting the neuropsychological evaluation of Pearce, Dr. Dee's overall opinion was that Pearce showed clear evidence of brain damage in the right hemisphere. Dr. Dee further concluded that Pearce was under the influence of extreme mental or emotional disturbance when the offense was committed. Dr. Dee found that Pearce's brain damage and cognitive problems, Pearce's mood disorder, Pearce's drug abuse, and the impulsivity that is part of the brain damage constituted major mental or emotional disturbance. Dr. Robert Berland, a board certified forensic psychologist, reached a similar diagnosis. Dr. Robert Berland found evidence of a chronic or long-standing psychotic disturbance, a biologically caused mental illness. Dr. Robert Berland concluded that the felonies were committed while Pearce was under the influence of extreme mental or emotional disturbance, and the capacity of Pearce to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
Defense counsel indicated that Pearce did not want any form of mitigation presented during the penalty phase. However, an attorney's obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated because this is an integral part of a capital case. See State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002) (citing Rose, 675 So.2d 567 (holding that an attorney's failure to conduct a reasonable investigation for possible mitigating evidence may render counsel's assistance ineffective)). Although a defendant may waive mitigation, he should not do so blindly. Counsel must first investigate and advise the defendant so that the defendant reasonably understands what is being waived and reasonably understands the ramifications of a waiver. The defendant must be able to make an informed, intelligent decision. See, e.g., Lewis, 838 So.2d at 1113 (citing Koon v. Dugger, 619 So.2d 246, 249 (Fla.1993)); Deaton v. Dugger, 635 So.2d 4, 8 (Fla.1993).
We find there is competent, substantial evidence to support the trial court's finding that counsel did not spend sufficient time to prepare for mitigation prior to Pearce's waiver. In preparing for the penalty phase, counsel never investigated Pearce's background, never interviewed members of Pearce's family, and never investigated mental health issues. Therefore, *1103 counsel was unable to advise Pearce as to potential mitigation. Thus, the evidence supports the trial court's finding that Pearce's waiver of the presentation of mitigating evidence was not knowingly, voluntarily, and intelligently made. Pearce suffered prejudice based on this lack of a knowing waiver because there was substantial mitigating evidence which was available but undiscovered. We affirm the trial court's conclusion that Pearce established a claim for ineffective assistance of counsel in the penalty phase of the trial.

CONCLUSION
For the reasons expressed above, we reverse the portion of the trial court's order granting Pearce a new trial, but affirm the portion of trial court's order granting him a new penalty phase and remand for a new sentencing proceeding before a jury.
It is so ordered.
QUINCE, C.J., and WELLS, ANSTEAD, PARIENTE, and LEWIS, JJ., concur.
CANADY and POLSTON, JJ., did not participate.
NOTES
[1] In his direct appeal, Pearce raised five issues, three in connection with the guilt phase of the trial and two in connection with the penalty phase proceedings. Pearce claimed that the trial court erred when it (1) refused to allow defense counsel to impeach a State witness with a previous videotaped statement; (2) denied his motion for judgment of acquittal on first-degree murder on the element of premeditation; (3) denied his motion for judgment of acquittal on felony murder; (4) found the aggravating circumstance that the murder occurred during the course of a kidnapping; and (5) found the cold, calculated, and premeditated (CCP) aggravating circumstance. Id. at 568.
[2] Pearce and his codefendant Lawrence Joseph Smith were tried separately for these crimes.
[3] Spencer v. State, 615 So.2d 688 (Fla.1993).
[4] In his motion Pearce made the following eight claims: (1) he was denied the effective assistance of counsel at the guilt phase of his trial because his counsel failed to object to the introduction of evidence of an uncharged offense, failed to object during the direct examination of Theodore Butterfield, and failed to refresh the memory of witness Heath Brittingham; (2) he was denied the effective assistance of counsel at the penalty phase of his trial because his counsel failed to have him evaluated by a mental health professional, and failed to conduct an adequate investigation into his background to provide statutory and nonstatutory mitigation; (3) the Florida death sentencing statute as applied is unconstitutional; (4) section 921.141, Florida Statutes, is facially vague and overbroad in violation of the United States Constitution and the unconstitutionality was not cured; (5) his Eighth Amendment right against cruel and unusual punishment will be violated as he may be incompetent at time of execution; (6) his trial was filled with procedural and substantive errors that cannot be harmless when viewed as a whole; (7) the jury instructions shifting the burden to him to prove death was inappropriate and unconstitutional; and (8) execution by lethal injection constitutes cruel and unusual punishment that would deprive him of due process and equal protection in violation of the United States Constitution. The evidentiary hearing only addressed claims one and two.