PER CURIAM.
Robert Shannon Walker, II, was convicted of the 2003 first-degree murder, kidnapping, and aggravated battery of David “Opie” Hamman and sentenced to death. On direct appeal, this Court affirmed Walker’s convictions and death sentence. Walker v. State, 957 So.2d 560, 570 (Fla.2007). Walker later filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851. Walker appeals from the postconviction court’s denial of his guilt-phase claims, and the State cross-appeals the postconviction court’s grant of a new penalty phase.[1]

I. FACTS AND PROCEDURAL HISTORY

The facts of this case were fully set out in this Court’s opinion on direct appeal:
In the late evening hours of January 26, 2003, the victim, David “Opie” Ham-man, arrived at the second-floor apartment of Joel Gibson in the city of Palm Bay, located in Brevard County, Florida. Accompanying Hamman were two women, Leslie Ritter and Hamman’s girlfriend, Loriann Gibson. The appellant, Robert Shannon Walker, II, was waiting inside the apartment with his girlfriend, Leigh Valorie Ford, and Joel Gibson.
Immediately after Hamman entered Joel’s apartment, Walker and Ford viciously attacked Hamman, beating him with various objects including the head of a metal Maglite flashlight, a baton type weapon, and a blackjack. Although not actively participating, Joel seemed to be supervising the attack. The attack on Hamman was drug-related. About a half hour into the attack, Joel, Walker, and Ford forced Hamman to strip down to only his socks to ensure he was not wearing a wire because they suspected that Hamman was a Drug Enforcement Administration (DEA) agent. They also forced Ritter and Loriann Gibson to strip down to their underwear in order to check for wires but permitted the women to redress.
After being searched, the women went to the back bedroom. They last saw Hamman lying on a bloody sheet on the living room floor, naked, with one of his eyes halfway hanging out. There was blood all over the apartment. From the back bedroom, the women heard Walker and Ford asking Hamman, “Are you ready to die?” and heard Joel saying Hamman was going to die that night. They also heard Hamman plead for his life and scream, “Please, stop, I don’t want to die. Please don’t kill me. It hurts.”
The attack on Hamman at Joel’s apartment lasted between two and three hours. Sometime around midnight, Hamman tried to escape. While Walker and Ford were distracted, Hamman ran out of the apartment and made his way down the stairs, leaving a trail of blood behind him. When Walker and Ford discovered Hamman had escaped, Ford said, “Get the bag and stuff and put them in the trunk,” and “get the tarp and lay it in the trunk.” Hamman made it a short distance down the road leading away from Joel’s apartment before being caught by Walker and Ford. He had left drops of blood on the parking lot and the road at the point where Walker and Ford caught him, near the apartment mailboxes.
*132 Walker and Ford put the tarp in the trunk of Ford’s automobile and forced Hamman to get in. Walker told Ford to find a remote spot to take Hamman. Ford drove her car with Hamman in the trunk, and Walker drove Hamman’s pickup truck. On the way, they stopped at the house of Joel Gibson’s girlfriend, Lisa Protz. Protz saw that Walker had a gun. Walker asked Protz for gasoline, rope, and tape, but she only gave him tape. A few minutes later, Ford arrived, and not long after that, Joel called on Protz’s phone. While talking to Joel, Walker wrapped the tape around his fingers.
Walker and Ford then left and drove to a remote area down a dirt road just outside the gates to the Tom Lawton Recreation Area, a state park. At some point between Joel Gibson’s apartment and the park, Hamman’s hands were bound behind his back with a plastic cable tie. Just outside the park gates, Hamman was taken out of the trunk and forced to lie down with his back on the ground. Walker then shot Hamman six times in the face with a Llama .45 pistol. Walker left Hamman on the road and drove back to Joel Gibson’s apartment.
[[Image here]]
After waiving his Miranda rights and signing a waiver-of-rights form, Walker gave a taped statement to Agents Herrera and Heyn in which he confessed to beating, kidnapping, and shooting David Hamman. Walker admitted to beating Hamman with a Maglite flashlight when Hamman arrived at Joel’s apartment but claimed that they mainly argued. Walker said that he made Hamman sit on the couch and questioned Hamman about being wired and about being a “cop.” He told Hamman to strip, and Hamman complied. Walker claimed that he hit Hamman only three to four more times before Hamman ran naked from the apartment. Walker explained he “just wanted to slap the piss out of [Hamman] because he scared me.”
Walker also admitted to chasing Ham-man down and taking him for a ride in the trunk of Ford’s car, but claimed that Hamman got in and out of the trunk on his own. Walker claimed that when they arrived outside the state park, Hamman told Walker that he knew the address of Walker’s parents and was going to rape Walker’s mother while he videotaped it. Walker then admitted to binding Hamman’s hands and shooting Hamman with the Llama .45. Walker said that Hamman’s body was lying face up beside the truck at the time he was shot. Walker said that he only meant to scare Hamman and humiliate him by driving him out to a remote location and forcing him to walk back naked. He explained that he only killed Hamman after Hamman scared him by making threats to harm his family. After that, Walker confirmed that he went back to Joel Gibson’s apartment and asked Rit-ter and Loriann Gibson to take him for a ride in Hamman’s truck. When they stopped in Live Oak, the women left Walker at the gas station.
Walker, 957 So.2d at 565-67 (footnotes omitted).
At the penalty phase, Walker presented testimony from two mental health experts, which this Court summarized as follows:
Both Dr. Radin and Dr. Bernstein diagnosed Walker as having bipolar disorder. Dr. Radin admitted that he “hardly observed” Walker’s mood swings and did not really have evidence of bipolar disorder apart from Walker’s self-reporting. Walker had never been previously diagnosed as bipolar. Although Walker reported that he had seen someone for therapy for eight to ten months *133 when he was fifteen years old, Dr. Radin did not perceive Walker’s condition as being longstanding.
Dr. Radin also testified that people facing serious charges often manifest anxiety or depression and that some people with Walker’s bipolar condition might self-medicate with alcohol, marijuana, cocaine, or methamphetamines. He testified that consumption of these types of drugs alters one’s thinking capacity. Dr. Bernstein also testified that people who are depressed tend to self-medicate with something that is fast acting, such as crack cocaine, methamphet-amines, or “speed.” He further testified that speed is not a narcotic but a central nervous system stimulant, and if a bipolar person used speed for a few days, the person’s mental activity would likely become more hyperactive. He further testified that ingestion of drugs would aggravate the bipolar disorder.
Id. at 583. The jury recommended death by a seven to five vote. Id. at 569.
At the Spencer[2] hearing, the trial court indicated that it received letters from Walker’s sister and Walker’s friend requesting that the trial court show mercy on Walker. At the sentencing hearing, another one of Walker’s friends, Jean Re-bert, testified that Walker had been addicted to drugs and that the drugs made him violent. Rebert had a counseling background but had only, in her words, a “grandmotherly-type” relationship with Walker that lasted “on and off for about three years.”
The trial court found three aggravators[3] and four mitigators.[4] The trial court followed the jury’s recommendation and imposed the death penalty. And on direct appeal, this Court affirmed Walker’s convictions and death sentence. Id. at 570.[5]
Walker subsequently filed a motion for postconviction relief in the trial court alleging numerous instances of ineffective assistance of counsel. He also raised various constitutional challenges to the death penalty. The postconviction court denied the guilt-phase and constitutional claims but granted a new penalty phase after finding that defense counsel was ineffective at the penalty phase for failing to *134 investigate mitigating evidence. Walker now appeals the denial of postconviction relief on his guilt-phase claims. The State cross-appeals the trial court’s decision to grant relief on Walker’s penalty-phase claim.

II. MOTION FOR POSTCONVICTION RELIEF

On appeal from the partial denial of postconviction relief, Walker claims that the trial court erred in summarily denying his claim that counsel was ineffective for (A) failing to object to evidence on possible blood stains outside the apartment; and (B) failing to present evidence to the jury that Walker’s statement to law enforcement was involuntary. Walker also alleges (C) cumulative error. We affirm the trial court’s denial of relief on these issues.
Following the United State Supreme Court’s decision in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.
Bolin v. State, 41 So.3d 151, 155 (Fla.2010) (quoting Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986)). Where this Court previously has rejected a substantive claim on the merits, counsel cannot be deemed ineffective for failing to make a meritless argument. Melendez v. State, 612 So.2d 1366, 1369 (Fla.1992).
There is a strong presumption that trial counsel’s performance was not deficient. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Id. at 689, 104 S.Ct. 2052. The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). “Judicial scrutiny of counsel’s performance must be highly deferential.” Id. In Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000), this Court held that “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”
Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing the circuit court’s legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
In determining entitlement to an eviden-tiary hearing, this Court has provided the following standard:
Because a court’s decision whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review. See State v. Coney, 845 So.2d 120, 137 (Fla.2003) (holding that “pure questions of law” *135 that are discernible from the record “are subject to de novo review”). Accordingly, when reviewing a court’s summary denial of an initial rule 3.851 motion, the Court must accept the movant’s factual allegations as true, and the Court will affirm the ruling only if the filings show that the movant has failed to state a facially sufficient claim or that there is no issue of material fact to be determined. See Amendments to Fla. Rules of Crim. Pro. 3.851, 3.852, & 3.993, 772 So.2d 488, 491 n. 2 (Fla.2000) (Amendments I). However, to the extent there is any question as to whether a rule 8.851 movant has made a facially sufficient claim requiring a factual determination, the Court will presume that an evidentiary hearing is required. See id.
... In other words, a postconviction claim may be summarily denied only when the claim is “legally insufficient, should have been brought on direct appeal, or [is] positively refuted by the record.” Connor v. State, 979 So.2d 852, 868 (Fla.2007).
Seibert v. State, 64 So.3d 67, 75 (Fla.2010) (footnote omitted).

A. Failure to object to possible blood stains

Walker argues that the postconviction court erred in summarily denying his claim that defense counsel was ineffective for failing to object in a timely manner to the admission of photographs depicting possible blood stains outside the apartment on the stairs. Specifically, he alleges that, although defense counsel objected when the prosecution sought to admit the photographs at trial, his counsel was ineffective for failing to object to the photographs earlier, before the jury heard the crime scene detective characterize the photographs as depicting “apparent blood stains.” We disagree.
Walker’s defense counsel cannot be deemed deficient for failing to lodge an earlier objection to the photographs because an earlier objection, like the later objection, would have been meritless. See Raleigh v. State, 932 So.2d 1054, 1064 (Fla.2006) (“[D]efense counsel cannot be deemed deficient for failing to make a meritless objection.”). As Walker recognized in his postconviction motion, defense counsel objected to the admission of the photographs of the apartment stairs at trial, and the trial court’s decision to admit the photographs over defense counsel’s objection was affirmed by this Court on direct appeal. Walker, 957 So.2d at 569. Walker’s attempt to focus his argument on the timing of counsel’s objection to the same evidence does not alter the underlying issue of admissibility of the photographs.
Even if defense counsel should have objected prior to the witness’s description of the photographs, Walker cannot establish prejudice. “Under Strickland, a defendant is prejudiced by his counsel’s deficient performance if ‘there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.’ ” Porter v. McCollum, — U.S. —, 130 S.Ct. 447, 453, 175 L.Ed.2d 398 (2009) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Here, this prejudice prong of Strickland cannot be satisfied because Walker confessed to the murder and, specifically, to beating the victim in the apartment, chasing him down, and putting him in the trunk of Ford’s car. The prosecution presented evidence independent of the photographs to demonstrate that the victim was severely beaten and bloodied and that blood matching the *136 victim’s DNA profile was located inside the upstairs apartment and in Ford’s trunk.[6]
Therefore, Walker’s claim was properly denied without a hearing by the trial court.

B. Failure to present evidence to the jury that Walker’s confession was involuntary

Walker also argues that the post-conviction court erred in summarily denying his claim that defense counsel was ineffective for failing to present evidence to the jury that Walker’s confession was involuntary. Prior to trial, Walker moved to suppress his statement to law enforcement on the ground that it was involuntarily made under the influence of mind-altering drugs. The trial court viewed the videotaped interrogation and heard evidence on Walker’s drug use on the day of his arrest. Ultimately, the trial court found that “there was insufficient evidence as to the exact drugs used or the amount” and ruled that, based on the totality of the circumstances, Walker’s waiver and confession were knowingly and intelligently given. This Court affirmed, determining that the trial court’s ruling on voluntariness was supported by competent, substantial evidence. Walker, 957 So.2d at 575.
Walker asserts that defense counsel should have presented the same information to the jury during the trial because the jury could have decided that the confession was involuntary. In support, he references Florida Standard Instruction in Criminal Cases 3.9(e), which was given prior to deliberations in this case and advises the jury as follows:
A statement claimed to have been made by the defendant outside of court has been placed before you. Such a statement should always be considered with caution and be weighed with great care to make certain it was freely and voluntarily made.
Therefore, you must determine from the evidence that the defendant’s alleged statement was knowingly, voluntarily, and freely made.
In making this determination, you should consider the total circumstances, including but not limited to:
1. whether, when the defendant made the statement, [he] had been threatened in order to get [him] to make it, and
2. whether anyone had promised [him] anything in order to get [him] to make it.

If you conclude the defendant’s out of court statement was not freely and voluntarily made, you should disregard it.

Emphasis added.
The trial court did not err in summarily denying Walker’s claim of ineffective assistance of counsel because the underlying claim that Walker’s statement was involuntary is meritless. On direct appeal, this Court concluded that there was “competent, substantial evidence to support the trial court’s conclusion that Walker made a knowing, voluntary, and intelligent decision to waive his Miranda rights and give his statement to police.” Walker, 957 *137 So.2d at 576. Walker is not permitted to relitigate the voluntariness of his confession on postconviction appeal. See Green v. State, 975 So.2d 1090, 1106 (Fla.2008) (“Because the ... issue was raised on direct appeal, Green is not permitted to relitigate it on postconviction appeal.”).
However, even if defense counsel was deficient for failing to present evidence of intoxication to the jury, Walker cannot establish prejudice. The available evidence on drug impairment and sleeplessness was, as the trial court found, insufficient to show lack of voluntariness and conflicted with testimony from officers that Walker showed no signs of drug influence at questioning. See Thomas v. State, 456 So.2d 454, 458 (Fla.1984) (“[T]he drunken condition of an accused when making a confession, unless such drunkenness goes to the extent of mania, does not affect the admissibility in evidence of such confession ....”) (quoting Lindsey v. State, 66 Fla. 341, 63 So. 832, 833 (1913) (emphasis added)). Walker does not allege that counsel should have advanced any evidence beyond that previously presented to the trial court at the suppression hearing. Therefore, even if defense counsel was deficient for failing to present evidence of intoxication to the jury, there is no “reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Porter, 130 S.Ct. at 453 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). Our confidence is not undermined. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (“A reasonable probability is a probability sufficient to undermine confidence in the outcome.”).
Accordingly, the trial court did not err in summarily denying this claim of ineffective assistance of counsel.

C. Cumulative error

Because Walker has failed to provide this Court with any basis for relief in any of his postconviction claims, Walker is not entitled to relief based on cumulative error. See Bradley v. State, 33 So.3d 664, 684 (Fla.2010).

III. STATE’S CROSS-APPEAL

The State argues that the post-conviction court erred in finding that defense counsel was ineffective at the penalty phase. We disagree and affirm the post-conviction court’s order granting a new penalty phase.
In evaluating alleged deficiency during the penalty phase, this Court has recognized that “an attorney has a strict duty to conduct a reasonable investigation of a defendant’s background for possible mitigating evidence.” State v. Riechmann, 111 So.2d 342, 350 (Fla.2000). “In the penalty phase of a trial, ‘[t]he major requirement ... is that the sentence be individualized by focusing on the particularized characteristics of the individual.’ ” Cooper v. Sec’y, Dep’t of Corr., 646 F.3d 1328, 1354 (11th Cir.2011) (quoting Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir.1987)). “Therefore, ‘[i]t is unreasonable to discount to irrelevance the evidence of [a defendant’s] abusive childhood.’” Id. (quoting Porter, 130 S.Ct. at 455). We have specified that “investigations into mitigating evidence ‘should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.’” Blackwood v. State, 946 So.2d 960, 974 (Fla.2006) (quoting Wiggins v. Smith, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). This Court has also specifically noted that “both Wiggins [, 539 U.S. at 524,] and the ABA Guidelines for Appointment and Performance of Counsel in *138 Death Penalty Cases § 10.11 (rev. ed. 2003) on counsel’s duties mandate mitigation investigation and preparation, even if the client objects.” Henry v. State, 937 So.2d 563, 573 (Fla.2006) (emphasis added).
To show prejudice under Strickland, the defendant “must show that but for his counsel’s deficiency, there is a reasonable probability he would have received a different sentence. To assess that probability, we consider ‘the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the [postconviction] proceeding’ — and ‘reweig[h] it against the evidence in aggravation.’ ” Porter, 130 S.Ct. at 453-54 (quoting Williams v. Taylor, 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). “A reasonable probability is a ‘probability sufficient to undermine confidence in the outcome.’ ” Henry v. State, 948 So.2d 609, 617 (Fla.2006) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052).
In this case, defense counsel testified that he investigated potential mitigation evidence by conducting five phone conversations with Walker’s mother and sister and by talking to some mostly unidentified “local people.” Defense counsel never sought medical, educational, criminal, drug treatment, or social service records.[7] He did not seek background information from any other immediate or extended family members prior to trial. Walker’s counsel also declined to contact Christopher Walker, Walker’s cousin, who provided extensive testimony on Walker’s family background at the evidentiary hearing, even though Walker was using Christopher’s name and identification at the time of his arrest. Once Walker’s trial began, defense counsel met with Walker’s mother and father, observed that “they were pathetic looking,” but did not do any research regarding the family’s background. Defense counsel did not attempt to speak with any former neighbors, correctional officers, or teachers familiar with Walker.
Defense counsel presented just two witnesses at the penalty phase, Dr. Radin and Dr. Bernstein, both of whom diagnosed Walker with bipolar disorder while in jail awaiting trial. Walker, 957 So.2d at 583. The experts together provided generalized information regarding the tendency of those with bipolar disorder to “self-medicate” with drugs and the likelihood that such drugs would aggravate the disorder. Id. Neither expert, however, discussed Walker’s history with drugs or their role in the crime. At the Spencer hearing, defense counsel declined to present any additional evidence and did not request a continuance to review the letters received by the judge, letters that defense counsel had not seen before.
In contrast, at the postconviction eviden-tiary hearing, Walker presented extensive testimony from family and friends concerning his background and family history as well as testimony from two additional experts with knowledge specific to Walker’s drug addiction and lifelong emotional and educational problems. First, Walker’s cousin, Anita Morris, testified that she was available and would have testified at the penalty phase if asked. She was “very close” with Walker growing up and frequently visited his home until she was a teenager. Morris testified that Walker’s parents hosted frequent, chaotic parties in which 30-40 visitors abused alcohol, mari *139 juana, and hallucinogens. She remembered the environment as a scary one in which adults engaged in routine violence and laid on the floor intoxicated as the children were neglected and allowed to sample drugs. She would retreat from the home whenever possible.
Morris observed Walker taking drugs as a child and knew him to be exposed to drugs on a daily basis. According to Morris, Walker’s parents did not provide for his basic needs and instead spent money on drugs and alcohol. Walker’s mother believed she could talk to spirits and regularly abused marijuana and hallucinogenic mushrooms. One of Walker’s sisters was retarded, one had mental illness problems, and all three of his sisters had drug problems. Morris testified that when Walker was a child, he was overweight and had regular bowel control problems. His parents and other family members made fun of him, and Walker would frequently lose control and attack people.
Another cousin, Christopher Walker, testified that he was available and would have testified at the penalty phase if asked. Christopher was a year older than Walker, and the two grew up together like brothers. He too observed chaotic parties involving cocaine, LSD, and marijuana use and witnessed numerous occasions in which violence, sometimes involving Walker’s parents, resulted in severe injuries requiring hospitalization. Christopher remembered adults openly using drugs in front of them and recalled leaving the house to get away from violence. He said that Walker’s father abused drugs and alcohol and that Walker’s mother practiced witchcraft, abused LSD, cocaine, and marijuana, and would give drugs to members of the family. Christopher further testified that when he and Walker were children, Walker’s family would provide them with drugs if the children were unable to take it from the table. By age eleven, he and Walker were involved in the parties and were drinking and taking drugs on a daily basis. Christopher testified that Walker was using LSD at age fourteen or fifteen. He recalled all of Walker’s family members engaged in substance abuse and two of Walker’s sisters having serious mental issues.
Christopher testified that Walker’s parents did not provide for Walker and would only occasionally provide Walker with food. He and Walker had to find their own meals and were not supervised as children. Christopher recalled Walker and his parents getting physically violent with one another and remembers running from the house with Walker to escape. He also testified that Walker would bite his teachers and pull their hair. Christopher said that Walker’s bowel control problems persisted until Walker was a teenager and that he developed “violent tendencies.” Christopher testified that Walker was in special education classes. When Walker was a teenager, an older man “took [Walker] under his wing” and introduced him to a criminal motorcycle gang known for dealing drugs, bombing cars, and shooting people. During this time, the quantity and types of drugs Christopher and Walker ingested started to increase and expanded to include crystal methamphetamines, “a lot of PCP,” and “lots of cocaine.” Christopher testified that he and Walker continued to abuse drugs together throughout their teenage years and into their twenties. Walker moved to Florida when Walker was in his mid- to late-twenties. When he came to visit once, however, Christopher observed that Walker was using crystal metham-phetamines and not sleeping. Walker appeared to be scared and “running from something.”
*140 Jean Rebert, the friend who testified at the sentencing hearing, testified at the postconviction evidentiary hearing that she was not contacted until after the trial but that she would have been available and willing to testify at the penalty phase if asked. Rebert’s son knew Walker when Walker was a teenager and the two were involved in the motorcycle gang. Her son was later incarcerated for racketeering and drug dealing associated with that involvement. She testified that she met Walker when he came to Florida with his wife and that she never saw Walker using drugs. However, she learned from Walker’s sister that he was allowed to use drugs and alcohol as a toddler and that she saw Walker experience dramatic weight loss and begin to resemble someone addicted to crack cocaine or methamphetamine.
Another friend, Gene D’Oria, testified that he was never contacted but was willing and available to testify at the penalty phase. He met Walker when Walker was in the motorcycle gang, and the two started using drugs together. At first, he said, the methamphetamine use was “casual” and confined to weekends. After a year of methamphetamine, cocaine, ecstasy, and marijuana use, however, Walker was staying awake to use methamphetamine for days at a time, had “dope sores” on his stomach and arms, developed bad teeth, and lost a significant amount of weight. Six to eight months prior to the murders, Walker appeared “scary” and no longer trusted anyone. D’Oria’s friendship with Walker ended about a week before the murder because Walker became so paranoid that he attacked a mutual friend.
Walker also presented expert testimony from Edward Gratzick, a social worker and therapist to whom Walker was referred by the juvenile court when Walker was fifteen. Gratzick testified that Walker had no physical problems but would lose control of his bowels daily or every other day until he was nine years old. Gratzick testified that Walker started receiving special education as an emotionally disturbed child in second grade and that attempts to place him in mainstream classes did not work because of Walker’s “emotional verbal outbursts.” He said that Walker dropped out of school and quit therapy at age sixteen.
Finally, Walker presented expert testimony from Dr. William Morton, a psycho-pharmacologist, who reviewed records, interviewed Walker and others familiar with Walker, and testified regarding Walker’s addiction to methamphetamine and the effects of various drugs on Walker’s brain. Dr. Morton testified that Walker put methamphetamines in his coffee in the morning and swallowed and sniffed it throughout the day. He testified that Walker was using two to four grams of methamphetamine every day, a level of abuse that typically results in drug-induced delirium, pronounced paranoia, and psychosis. His discussions with witnesses and information gathered from police reports confirmed that at the time of the crime, Walker was suffering from impul-sivity, distorted perceptions, persistent paranoia, hallucinations, and very high anxiety.[8]
In its order granting relief on this claim, the postconviction court found that the testimony presented at the evidentiary hearing, unlike the evidence at the penalty phase, “gave considerable insight into [Walker’s] childhood and young adulthood,” serving to humanize him to the *141 jury. The postconviction court concluded that if the evidence had been presented at trial, it was likely to constitute “strong” and “important” mitigation likely to influence at least one juror. Furthermore, the postconviction court considered the information regarding Walker’s substance abuse to be a mitigator under these circumstances.
The postconviction court did not err in concluding that counsel was ineffective. Rodriguez v. State, 919 So.2d 1252, 1264 (Fla.2005) (“In the past, this Court has found ineffectiveness where no attempt was made to investigate mitigation even though substantial mitigating evidence could have been presented”).[9] First, even if Walker was resistant to defense counsel’s efforts, defense counsel’s failure to attempt to collect background records and testimony from available family members and friends supports the conclusion that counsel’s performance was deficient. See Cooper, 646 F.3d at 1354; Henry, 937 So.2d at 573 (noting that counsel must investigate mitigation “even if the client objects”); of. Peede v. State, 955 So.2d 480, 493 (Fla.2007) (finding counsel not ineffective where “the record supports both the finding of lack of cooperation by Peede and counsel’s efforts notwithstanding Peede's recalcitrance ”) (emphasis added). Defense counsel’s failure to attempt to obtain reasonably available mitigating evidence from available sources precludes the State’s argument that counsel reasonably chose against advancing the potentially detrimental testimony presented at the evidentiary hearing. See Rose v. State, 675 So.2d 567, 572-73 (Fla.1996) (finding counsel’s decision neither informed nor strategic where “there was no investigation of options or meaningful choice”).
Second, Walker has established prejudice. After reweighing the evidence in aggravation against the mitigation evidence presented during the postconviction evidentiary hearing and the penalty phase, our confidence in the outcome of the penalty phase trial is undermined. See Porter, 130 S.Ct. at 453-54. Walker had a troubled history that was at minimum relevant to assessing his moral culpability. See Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (“Evidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... may be less culpable than defendants who have no such excuse.”) (quoting California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O’Connor, J., concurring)); Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (noting that consideration of the capital defendant’s background is a “part of the process of inflicting the penalty of death”) (quoting *142 Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)). Considering the lack of background evidence produced at trial, the wealth of such evidence produced at the postconviction hearing, and the trial court’s determination that its presentation was likely to result in “strong” or “important” miti-gators, our confidence in the outcome of the penalty phase trial is undermined. See Porter, 130 S.Ct. at 453-54; Ferrell v. State, 29 So.3d 959, 985 (Fla.2010) (affirming a finding of prejudice because “there was substantial mitigating evidence which was available but undiscovered”) (quoting State v. Pearce, 994 So.2d 1094, 1103 (Fla.2008)). The State’s argument that the evidence presented at the postconviction hearing was cumulative is unsupported by the record, which demonstrates a lack of penalty-phase testimony on Walker’s turbulent background, family history, and drug addiction.
Accordingly, the trial court did not err in concluding that defense counsel was ineffective during the penalty phase and in granting Walker a new penalty phase.

IV. CONCLUSION

Based on the foregoing, we affirm the trial court’s order denying Walker’s guilt-phase claims and granting a new penalty phase.
It is so ordered.
CANADY, C.J., and.PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The trial court found the following aggrava-tors: (1) the murder was committed during the course of a kidnapping (great weight); (2) the murder was especially heinous, atrocious, or cruel (great weight); and (3) the murder was cold, calculated, and premeditated (great weight).

. The trial court found the following miti-gators: (1) Walker was affected by the use of drugs, bipolar disorder, and sleep deprivation on the night of the murder (moderate weight); (2) Walker's codefendant received a life sentence (some weight); (3) Walker gave a statement to the police (moderate weight); and (4) Walker showed remorse (slight weight).

. On direct appeal, Walker argued that (1) the trial court erred in denying his motion to suppress his statement to law enforcement because his statement was involuntary; (2) the trial court erred in denying his motion to declare Florida’s capital sentencing scheme unconstitutional because a judge rather than a unanimous jury determines death penalty aggravators; (3) the trial court erred in denying his motion for judgment of acquittal; (4) the trial court erred in weighing the aggravating and mitigating factors; (5) the trial court erred by admitting photographic evidence which was either irrelevant or gruesome and unduly prejudicial; (6) the trial court erred in denying Walker’s motion for a statement of particulars regarding the aggravating circumstances and the State’s theory of prosecution; and (7) the trial court erred under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), by denying Walker’s motion for findings of facts by the jury in a special verdict form. Walker, 957 So.2d at 569.

. Walker also argues that a postconviction evidentiary hearing was necessary so that the trial court could hear evidence of an unrelated fight on the same steps, suggesting that counsel was also ineffective for failing to investigate the possibility that the blood could be attributed to another source. However, even if blood from another source was also found on the trail between the apartment and the trunk, Walker could not satisfy the prejudice prong of Strickland..- And, to any extent that Walker attempts to present newly discovered evidence, the claim fails because the evidence is not "of such nature that it would probably produce an acquittal on retrial.” Jones v. State, 709 So.2d 512, 521 (Fla.1998).

. Records from a social worker who worked with Walker as a child were found in defense counsel’s file during postconviction proceedings. But defense counsel did not remember receiving or viewing those records in preparation for the penalty phase, leading the post-conviction court to find that defense counsel "never pursued that lead.”

. Walker also presented expert testimony from Dr. Joseph Sesta concerning possible brain injury. But, because Walker refused to receive an MRI in preparation for the eviden-tiary hearing, the postconviction court found no basis to conclude that the testimony would have constituted significant mitigation evidence.

. Additionally, the trial court correctly determined that Walker did not make a knowing, voluntary, and intelligent waiver of mitigation evidence. See State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002). Because defense counsel failed to reasonably investigate mitigating evidence as set forth above, Walker did not have the opportunity to make an informed, intelligent decision. See id. at 1113-14 ("Although a defendant may waive mitigation, he cannot do so blindly; counsel must first investigate all avenues and advise the defendant so that the defendant reasonably understands what is being waived and its ramifications and hence is able to make an informed, intelligent decision.”); see also Ferrell v. State, 29 So.3d 959, 983 (Fla.2010) (determining that the defendant’s waiver was invalid where there was "no indication that trial counsel performed any investigation into the penalty phase”); State v. Pearce, 994 So.2d 1094, 1102 (Fla.2008) (determining that the defendant's waiver was invalid where "counsel never investigated Pearce’s background, never interviewed members of Pearce’s family, and never investigated mental health issues”).