# Supreme Court of Florida

_____

No. SC17-1618
_____

**PATRICK C. HANNON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC17-1837
_____

**PATRICK C. HANNON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[November 1, 2017]

PER CURIAM.

Patrick Hannon, a prisoner under sentences of death with an active death

warrant, appeals the circuit court's orders denying his third and fourth successive

motions for postconviction relief filed pursuant to Florida Rule of Criminal

Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the following reasons, we affirm the circuit court's denial of both motions and deny his motions for stay of execution.

## FACTS AND PROCEDURAL HISTORY

On direct appeal, this Court fully set forth the underlying facts. Hannon v. State (Hannon I), 638 So. 2d 39, 41 (Fla. 1994). Relevant to the instant proceeding, Hannon was found guilty of two counts of first-degree murder for the killings of Brandon Snider and Robert Carter. Id. After a penalty phase, the jury returned two unanimous death sentences. Id. Hannon appealed, and we affirmed the convictions and sentences. Id. at 41-44. On February 21, 1995, the United States Supreme Court denied certiorari, Hannon v. Florida, 513 U.S. 1158 (1995), thus, Hannon's case became final on that date.

We affirmed the denial of Hannon's initial motion for postconviction relief and denied his petition for writ of habeas corpus. Hannon v. State (Hannon II), 941 So. 2d 1109, 1150 (Fla. 2006). During the pendency of his initial postconviction motion, Hannon filed an interlocutory appeal after the circuit court denied his motion to prohibit DNA testing, which this Court dismissed. Hannon v. State (Hannon III), 817 So. 2d 847 (Fla. 2002) (Table).

Additionally, Hannon sought federal relief pursuant to a writ of habeas corpus, which was denied. Hannon v. Sec'y, Dep't of Corr. (Hannon IV), 622 F.

- 2 -

Supp. 2d 1169 (M.D. Fla. 2007). The Eleventh Circuit Court of Appeals granted Hannon's request for a certificate of appealability on one issue, but it denied relief. Hannon v. Sec'y, Dep't of Corr. (Hannon V), 562 F.3d 1146 (11th Cir. 2009).[1]

The postconviction court denied Hannon's first successive motion for postconviction relief, which we affirmed. Hannon v. State (Hannon VI), 94 So. 3d 502 (Fla. 2012). Again, the postconviction court denied Hannon's second motion for postconviction relief, and we affirmed. Hannon v. State (Hannon VII), SC15-2363, 2016 WL 3352780 (Fla. June 16, 2016).

Hannon filed his third successive motion for postconviction relief—while the second motion was pending appeal—raising various Hurst claims. The circuit

---

1. One of the issues litigated in Hannon's initial postconviction motion was counsel's failure to investigate and present mitigation. Hannon II, 941 So. 2d at 1125-38. Most of the dissent is based on this claim, however, that claim is procedurally barred here and also contrary to the factual circumstances. See, e.g., Hunter v. State, 29 So. 3d 256, 267 (Fla. 2008) ("Claims raised in prior postconviction proceedings cannot be relitigated in a subsequent postconviction motion unless the movant can demonstrate that the grounds for relief were not known and could not have been known at the time of the earlier proceeding."); Wright v. State, 857 So. 2d 861, 868 (Fla. 2003) ("We will not entertain a second appeal of claims that were raised, or should have been raised, in a prior postconviction proceeding."). Additionally, the dissent, in quoting a prior dissent at length, ignores the fact that it was Hannon and his family who made the decision not to present the mitigation with which the dissent again takes issue. Hannon II, 941 So. 2d at 1126-28. Furthermore, as the dissent notes, the district court in Hannon IV, 622 F. Supp. 2d at 1180-98, and the Eleventh Circuit in Hannon V, 562 F.3d at 1150-58, both denied relief to Hannon on this claim. Accordingly, no further discussion is necessary.

court held the third successive motion in abeyance pending the outcome of Hannon's appeal in this Court on his second successive motion, which was decided on June 16, 2016. On August 4, 2016, the circuit court entered a stay on Hannon's third successive motion, pending our decision on the retroactivity of Hurst v. Florida, 136 S. Ct. 616 (2016). Following our various opinions, the circuit court denied Hannon's third successive motion without an evidentiary hearing. Hannon appealed, and we stayed the proceedings pending the resolution of Hitchcock v. State, 42 Fla. L. Weekly S753 (Fla. Aug. 10, 2017), petition for cert. filed, No. 17-6180 (U.S. Sept. 29, 2017). When Hitchcock became final, we lifted the stay and issued an order to show cause why the denial of Hannon's third successive motion for postconviction relief should not be affirmed.

On October 6, 2017, Governor Rick Scott signed a death warrant for Hannon and set his execution for November 8, 2017. Hannon filed his fourth successive postconviction motion in the circuit court, raising three claims: (1) the lethal injection protocol is unconstitutional; (2) the Governor's warrant signing procedure is unconstitutional; and (3) Hannon's death sentences are disproportionate compared to his codefendants' sentences. The circuit court denied Hannon's claims without an evidentiary hearing.[2]

---

2. During our review, Hannon learned that sealed records were transmitted to the Capital Collateral Postconviction Records Repository without the parties' knowledge. We granted a twenty-four-hour relinquishment of jurisdiction for the

These appeals follow.

## ANALYSIS

### Constitutionality of Lethal Injection Protocol

Hannon presents various challenges that he asserts amount to a violation of his Florida constitutional and Eighth Amendment rights when considered together. The circuit court found that we recently approved the current injection protocol in Asay v. State (Asay VI), 224 So. 3d 695, 700-02 (Fla. 2017); thus, the court correctly rejected that portion of Hannon's claim. Further, the circuit court found that Hannon failed to establish his additional assertion that the three-drug protocol evaluated in conjunction with the Florida Department of Corrections' (DOC) "veil of secrecy" demonstrates that the DOC is inconsistent with its protocol and concealing signs of consciousness.

Hannon presented no new evidence that would require us to reconsider our recent approval of the three-drug protocol, therefore, no discussion of that portion of the claim is necessary. See id.

As to Hannon's "veil of secrecy" claim, the circuit court properly denied his challenge. The DOC is entitled to a presumption that it will properly perform its

---

"limited purpose of an in camera inspection of the sealed records." After conducting an in camera inspection, the circuit court entered an order on October 25, 2017, confirming that the sealed records did not entitle Hannon to relief.

duties while carrying out an execution.  Lightbourne v. McCollum, 969 So. 2d 326, 343 (Fla. 2007); Provenzano v. State, 761 So. 2d 1097, 1099 (Fla. 2000).  Moreover, we have noted that our "role is not to micromanage the executive branch in fulfilling its own duties relating to executions."  Troy v. State, 57 So. 3d 828, 840 (Fla. 2011) (quoting Lightbourne, 969 So. 2d at 351).  There is nothing before us sufficient to overcome the presumption that the DOC will comply with the protocol that we have approved regarding the necessary consciousness check.  See Howell v. State, 133 So. 3d 511, 522 (Fla. 2014); Valle v. State, 70 So. 3d 530, 545 (Fla. 2011) (rejecting a similar claim of "substitution of the drug, coupled with inadequate procedural safeguards and a cavalier attitude toward lethal injection" (emphasis in original)); Lightbourne, 969 So. 2d at 352.  In fact, one of the affidavits submitted by Hannon indicates that as recently as a few weeks ago, during Lambrix's execution, the DOC officials conducted a proper consciousness check.  See Correll v. State, 184 So. 3d 478, 484 n.8 (Fla. 2015) (detailing the consciousness check when the execution team members "yell the prisoner's name, lift the prisoner by the shoulders and shake him or her, flick the subject's eyelids, and pinch the trapezius muscle").  The burden was on Hannon to overcome the presumption afforded to the DOC, and he failed to carry his burden.  See Muhammad v. State, 132 So. 3d 176, 203 (Fla. 2013).  Thus, this portion of his claim fails.

Finally, we have consistently rejected Hannon's challenge that the DOC should substitute the current three-drug protocol with a one-drug protocol. See Asay VI, 224 So. 3d at 702; Muhammad, 132 So. 3d at 196-97.

Accordingly, even taking these claims together, the circuit court properly denied Hannon's challenge.

**The Governor's Warrant Signing Power**

Hannon challenges the power of the Governor to sign death warrants, which the circuit court properly denied. We have repeatedly and consistently denied these claims. E.g., Bolin v. State, 184 So. 3d 492, 502-03 (Fla. 2015), cert. denied, 136 S. Ct. 790 (2016); Mann v. State, 112 So. 3d 1158, 1162-63 (Fla. 2013); Ferguson v. State, 101 So. 3d 362, 366 (Fla. 2012); Gore v. State, 91 So. 3d 769, 780 (Fla. 2012); Valle, 70 So. 3d at 551-52. Hannon contends that we must revisit this settled point of law in light of Hurst, however, Hannon is mistaken. The narrowing function required by the Eighth Amendment, which we addressed in Hurst, has already been performed by the time that a defendant is warrant eligible. See Hurst v. State, 202 So. 3d 40, 59-63 (Fla. 2016), cert. denied, 137 S. Ct. 2161 (2017); Silvia v. State, 123 So. 3d 1148, 2013 WL 5035694 *1 (Fla. 2013) (Table) (defining warrant eligible).

Accordingly, the circuit court correctly denied relief to Hannon on this claim.

**Proportionality**

Hannon contends that his sentence is disproportionate when compared to his codefendants' sentences. The circuit court found that this claim was procedurally barred because it has been previously addressed on direct appeal and is untimely. We agree.

We rejected Hannon's proportionality claims on direct appeal and in his initial postconviction motion. Hannon I, 638 So. 2d at 44 (finding that "[c]learly, Hannon is the most culpable of the three accomplices in this case, and the two death sentences are justified"); Hannon II, 941 So. 2d at 1145 (affirming the postconviction court's denial of a similar claim couched in terms of newly discovered evidence "because the instant case does not involve equally culpable codefendants"). Because we have addressed this claim on direct appeal and postconviction, it is both procedurally barred and without substantive merit. E.g., Lukehart v. State, 70 So. 3d 503, 524 (Fla. 2011) ("Lukehart challenges this Court's proportionality determination from the direct appeal, . . . [t]his claim is procedurally barred, as it was raised and rejected on direct appeal."); Allen v. State, 854 So. 2d 1255, 1261-62 (Fla. 2003). Also, the claim is untimely. One of Hannon's codefendants, Charles Acker, was retried in 2001. Any claims related to that retrial are well outside the one-year time limitation prescribed by Rule 3.851(d)(1). And the circuit court correctly found that Hannon failed to establish

any of the Rule 3.851(d)(2) exceptions to the one-year limit. Because this claim is procedurally barred, we do not reach the merits of Hannon's arguments.

Likewise, Hannon raised claims regarding the testimony of an FBI analyst and blood spatter expert. We have twice rejected his claim regarding the FBI analyst, Hannon II, 941 So. 2d at 1145-46; Hannon VII, 2016 WL 3352780 at *1, and once rejected the claim regarding the blood spatter expert. Hannon II, 941 So. 2d at 1121-24. Thus, those claims must fail as well.

Contrary to the dissent's assertion, the record is actually quite clear that the wound inflicted to one victim's neck by Hannon was the fatal wound. Instead of basing a proportionality determination on Hannon's allegations and assertions, we rely on the record, which refuted the assertions. At Hannon's trial and Acker's retrial, the medical examiner, Dr. Diggs, testified about the neck wound. He opined that the wounds inflicted by Acker could possibly be "potentially lethal"; whereas, the neck wound actually inflicted by Hannon was "certainly a lethal wound." Furthermore, the wounds inflicted by Acker would not have killed Snider for at least some extended time period; whereas, the wound inflicted by Hannon caused Snider to drop immediately and die in less than thirty seconds.[3] This case is

_____

3. At Hannon's trial, Dr. Diggs described the wound inflicted by Hannon to Snider's neck the following way:

So, when you got that amount of depth to the wound, it actually goes all the way back to the spine, you see. The wound actually stopped at

distinguishable from <u>McCloud v. State</u>, 208 So. 3d 668 (Fla. 2016), where we held that death was disproportionate, noting that "the jury explicitly determined by special interrogatory that McCloud was not the shooter" and that a "less culpable, non-triggerman defendant" cannot be sentenced to death when "the more culpable, triggerman defendant" is sentenced to a lesser sentence. <u>Id.</u> at 687-89. However, <u>McCloud</u> is inapposite because the record here demonstrates that Hannon was more culpable than his codefendants. Not only was Hannon the "triggerman" by shooting Carter, he was also the "buck-knife man" by slashing Snider's throat to the point of near decapitation. Our relative culpability analysis in <u>Hannon I</u>, 638 So. 2d at 44, was not dependent on who had the motive to kill Snider; rather, it was based on the facts in record, which demonstrated that Hannon killed Snider and Carter.

Although Hannon's codefendants were culpable, Hannon was the person who slashed Snider's throat and shot Carter six times; as such, it is as true today as it was twenty-three years ago: Hannon was "the most culpable of the three accomplices in this case." <u>Id.</u> Accordingly, the circuit court properly denied this claim.

---

the—at the backbone, the front of the backbone, of the cervical spine, as we call it. That's where it stopped. But it pretty much lacerated all of the tissue that normally sits in front of that. So, you're talking about a depth of approximately, about four inches.

- 10 -

**Records Requests**

Hannon challenges whether the circuit court abused its discretion in sustaining the State's objections to disclosure of certain public records. The disputed records fall into three general categories: (1) information regarding the three-drug protocol and the State's current supply; (2) records of the last eight executions along with records indicating personnel or undocumented protocol changes; and (3) records pertaining to the proportionality of Hannon's sentences.

We review rulings on public records requests pursuant to Florida Rule of Criminal Procedure 3.852 for abuse of discretion. Hill v. State, 921 So. 2d 579, 584 (Fla. 2006). "Discretion is abused only when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." Parker v. State, 904 So. 2d 370, 379 (Fla. 2005) (quoting State v. Coney, 845 So. 2d 120, 137 (Fla. 2003)). Rule 3.852 is "not intended to be a procedure authorizing a fishing expedition for records." Sims v. State, 753 So. 2d 66, 70 (Fla. 2000). For this reason, records requests under Rule 3.852(h) are limited to "persons and agencies who were the recipients of a public records request at the time the defendant began his or her postconviction odyssey," id.; whereas, records requests under Rule 3.852(i) must "show how the requested records relate to a colorable claim for postconviction relief and good cause as to why the public

records request was not made until after the death warrant was signed." Asay VI, 224 So. 3d at 700 (quoting Tompkins v. State, 872 So. 2d 230, 244 (Fla. 2003)).

First, the circuit court properly denied Hannon's records request regarding the three-drug protocol, including the sourcing, storage, and expiration dates of the State's supply of etomidate. The request at issue was directed at the DOC and Florida Department of Law Enforcement (FDLE) pursuant to Rule 3.852(i). We have specifically rejected similar claims in the past as "overbroad and burdensome":

> Muhammad contends the circuit court abused its discretion in refusing to order the DOC to disclose the manufacturers of the lethal injection drugs used in Florida executions, together with the lot numbers and expiration dates. No abuse of discretion has been shown. We have held that the source of the drugs used in lethal injection is of questionable relevance to a colorable Eighth Amendment claim. See Valle, 70 So. 3d at 549. The same principle would apply to the drugs' lot numbers and expiration dates. Moreover, this Court will presume that the DOC will act in accordance with its protocol and carry out its duties properly. See, e.g., id. This same presumption would extend to presume that the DOC will obtain viable versions of the drugs it intends to use and confirm before use that the drugs are still viable, as the protocol requires.

Muhammad, 132 So. 3d at 203, 206. Moreover, in Walton v. State, 3 So. 3d 1000 (Fla. 2009), this Court stated that production of records relating to lethal injection are "unlikely to lead to a colorable claim for relief [when] the challenge to the constitutionality of lethal injection as currently administered in Florida has been fully considered and rejected by the Court." Id. at 1014. The current injection

protocol was fully considered and approved of in <u>Asay VI</u>, 224 So. 3d at 700-02. For these reasons, the circuit court did not abuse its discretion in denying Hannon's request.

Second, Hannon requested records for the last eight executions along with "unwritten changes" to the protocol. This request was made pursuant to Rule 3.852(i), and it was properly denied. As a practical matter, most of the requested records for previous executions were carried out using a different protocol, therefore, it is not likely that they relate to a colorable claim. Moreover, under our precedent, Hannon was not entitled to those records. In <u>Valle</u>, we held that records of the last five executions were "not related to a colorable Eighth Amendment claim." 70 So. 3d at 549. Moving onto the "unwritten changes" portion of Hannon's challenge, he argues that the requested records are all related and necessary to his "veil of secrecy" claim. However, Hannon has the current protocol and possesses records regarding the current three-drug protocol disclosed as part of the <u>Asay VI</u> litigation. Thus, he has the records necessary to develop a colorable claim. Moreover, in <u>Muhammad</u>, we noted that records "requests related to actions of lethal injection personnel in past executions do not relate to a colorable claim concerning future executions because there is a presumption that members of the executive branch will perform their duties properly." 132 So. 3d at 203. Furthermore, Hannon fails to explain why he waited until the eve of

execution to request these records. His "unwritten changes" and related "veil of secrecy" claims would be more compelling had Hannon been actively pursuing these records. Instead, Hannon waited until a death warrant was signed and requested these voluminous records despite the truncated period for his postconviction motion. In the past, we have not condoned "eleventh hour attempt[s] to delay the execution" with records requests, and we will not begin now. See Sims, 753 So. 2d at 70; see also Tompkins, 872 So. 2d at 243-44. Thus, this portion of the claim was properly denied.

Third, Hannon's proportionality claim is procedurally barred, as addressed above. However, pertaining to his records request challenge, Hannon is in possession of the transcript from Acker's 2001 retrial, which he filed with this Court. Considering Hannon's claim, this is the record that Hannon would need in order to establish a colorable claim. Thus, the records request challenge is moot.

In sum, Hannon failed to demonstrate his entitlement to the disputed records, accordingly, the circuit court properly denied relief.

## **Hurst Claims**

In Hannon's third successive postconviction motion, he raised various Hurst challenges.[4] The circuit court correctly rejected each claim in accordance with our precedent.

Hannon's case became final on February 21, 1995. We have consistently held that Hurst is not retroactive prior to June 24, 2002, the date that Ring v. Arizona, 536 U.S. 584 (2002), was released. E.g., Lambrix v. State, 42 Fla. L. Weekly S833, 2017 WL 4320637 (Fla. Sept. 29, 2017), cert. denied, Nos. 17-6222, 17A375, 2017 WL 4409398 (U.S. Oct. 5, 2017); Hitchcock, 42 Fla. L. Weekly S753; Asay v. State (Asay V), 210 So. 3d 1, 22 (Fla. 2016), cert. denied, No. 16-9033, 2017 WL 1807588 (U.S. Aug. 24, 2017). Hannon contends that he raises novel chapter 2017-1, Laws of Florida, and Eighth Amendment challenges and that we have not addressed those issues; yet, Hannon is mistaken because we have expressly rejected these claims. Lambrix, 42 Fla. L. Weekly S833 (rejecting chapter 2017-1 and Eighth Amendment claims under Hurst); Asay VI, 224 So. 3d at 702-03 (rejecting chapter 2017-1 and Eighth Amendment claims as "not novel

---

4. The Hurst-related claims that Hannon raises in his Response to Order to Show Cause follow: (1) due process precludes the foreclosure of relief based on the decision in Hitchcock; (2) the Eighth Amendment and Florida Constitution entitle Hannon to retroactive application of Hurst; (3) chapter 2017-1 constitutes a substantive change in the law requiring retrospective application; and (4) Hannon's death sentences violate Hurst, and the error is not harmless.

and [] previously rejected by this Court"); Hitchcock, 42 Fla. L. Weekly at S753 (denying Hurst relief despite the fact that Hitchcock raised Eighth Amendment claims). Hannon chooses to ignore our precedent because he disagrees with the retroactivity cutoff that we set in Asay V, however, that decision is final and has been impliedly approved by the United States Supreme Court, which denied certiorari review. See Asay v. Florida, No. 16-9033, 2017 WL 1807588 (U.S. Aug. 24, 2017). Clearly, Hannon is not entitled to Hurst relief, thus, there is no Hurst error to review for harmless error.

Accordingly, the circuit court correctly denied Hannon's third successive motion for postconviction relief.

## Potential Caldwell[5] Claims

Hannon directs this Court to a dissent from the denial of certiorari in Truehill v. Florida, Nos. 16-9448, 17-5083, 2017 WL 2463876 (U.S. Oct. 16, 2017), cert. denied, (Sotomayor, J., dissenting). That dissent criticizes this Court for failing to address Eighth Amendment claims under Caldwell. We need not reach that issue in this case, however, because Hannon does not specifically raise a Caldwell claim in either appeal. Hannon's Eighth Amendment claim is essentially a challenge to the arbitrariness of our retroactivity decision in Asay V. Therefore,

---

5. Caldwell v. Mississippi, 472 U.S. 320 (1985).

- 16 -

although Hannon cites Truehill for the proposition that certain Supreme Court Justices believe that we have not resolved various Eighth Amendment issues, he does not raise an independent Caldwell challenge here. As described above, the Eighth Amendment claim that Hannon raised has been answered by this Court in other opinions.

The dissent asserts that Hannon raises a Caldwell claim in this Court. It is true that Hannon challenged his sentences under Caldwell in the circuit court, however, he did not raise that claim here. In his Response to Order to Show Cause, Hannon merely explained that he raised Caldwell claims in his initial postconviction motion,[6] Hannon II, 941 So. 2d at 1144, and argued that Caldwell supports his claim of harmful error under Hurst. There is no error to review for harmful error, thus, that portion of his claim fails with the harmful error claim itself.

## CONCLUSION

Based on the foregoing, we affirm the circuit court's denial of Hannon's third and fourth successive postconviction motions. Because we find that Hannon is not entitled to relief, we accordingly deny his motions for stay of execution. No

---

6. Although the dissent acknowledges this, it ignores how that fact would procedurally bar a Caldwell claim in this case. See, e.g., Hunter, 29 So. 3d at 267; Wright, 857 So. 2d at 868.

oral argument is necessary and no rehearing will be entertained by this Court. The

mandate shall issue immediately.

It is so ordered.

LABARGA, C.J., and LEWIS, POLSTON, and LAWSON, JJ., concur.
CANADY, J., concurs in result.
PARIENTE, J., dissents with an opinion.
QUINCE, J., recused.

PARIENTE, J., dissenting.

Consistent with my previous dissents,[7] I conclude that Hurst[8] should apply

retroactively to Hannon's sentence, and because Hannon's jury never heard the

substantial mitigation that could have been presented if his counsel had performed

a reasonable investigation, I would not rely on the jury's unanimous

recommendation for death to conclude that the Hurst error is harmless beyond a

---

7. See Lambrix v. State, 42 Fla. L Weekly S833, 2017 WL 4320637, *2-3 (Fla. Sept. 29, 2017) (Pariente, J., dissenting), cert. denied, Nos. 17-6222, 17A375, 2017 WL 4409398 (U.S. Oct. 5, 2017); Asay v. State (Asay VI), 224 So. 3d 695, 703-09 (Fla. 2017) (Pariente, J., dissenting); Hitchcock v. State, 42 Fla. L. Weekly S753, 2017 WL 3431500, *3 (Fla. Aug. 10, 2017) (Pariente, J., dissenting), petition for cert. filed, No. 17-6180 (U.S. Sept. 29, 2017); Asay v. State (Asay V), 210 So. 3d 1, 32-37 (Fla. 2016) (Pariente, J., concurring in part, dissenting in part), cert. denied, No. 16-9033, 2017 WL 1807588 (U.S. Aug. 24, 2017).

I note that this is not a case in which the defendant, before Hurst, waived the right to a penalty phase jury or the right to present mitigation altogether. Kaczmar v. State, 42 Fla. L. Weekly S127 (Fla. Jan. 31, 2017) (mitigation waiver); Mullens v. State, 197 So. 3d 16 (Fla. 2016) (penalty phase jury waiver), cert. denied, 137 S. Ct. 672 (2017).

8. Hurst v. State, 202 So. 3d 40, 59-60 (Fla. 2016), cert. denied, 137 S. Ct. 2161 (2017).

reasonable doubt.  See Kaczmar v. State, 42 Fla. L. Weekly S127, 2017 WL

410214, *11 (Fla. Jan. 31, 2017) (Pariente, J., concurring in part, dissenting in

part).  This Court has made clear that the death penalty "must be reserved only for

defendants convicted of the most aggravated and least mitigated murders," and I do

not believe that a jury has properly determined that Hannon is among those

defendants.  Hurst v. State, 202 So. 3d 40, 59-60 (Fla. 2016), cert. denied, 137 S.

Ct. 2161 (2017).

I joined Justice Anstead's dissenting opinion from this Court's denial of

Hannon's initial postconviction appeal, arguing that Hannon was entitled to a new

penalty phase due to counsel's failure to properly investigate and present

mitigation to the penalty phase jury.  Hannon v. State (Hannon II), 941 So. 2d

1109, 1166 (Fla. 2006) (Anstead, J., dissenting).  As to Hannon's counsel's failure

to investigate and present mitigation during the penalty phase, Justice Anstead

made clear:

> Shockingly, the record reflects that Hannon's counsel did no investigation for mitigation, and, in fact, initially was not going to present any form of mitigation during the penalty phase, even a continuing claim of not guilty.  Hannon's counsel stated at the postconviction evidentiary hearing, "Well, we had nothing to mitigate. He was not guilty.  He didn't do it.  That was it."  However, at the penalty phase the trial judge actually directed him to reconsider this irrational strategy; thereafter, Hannon's counsel presented the evidence relating to the "my client is too nice to have done this" strategy.
> . . . .

Although Hannon's counsel stated that he had asked Hannon's family members if Hannon was "born with any problems" and the family members did not bring any mental health issues to his attention, the testimony of Hannon's family members tells a different story. Hannon's sister stated that Hannon's counsel never asked her about his life before the murders, his drug and alcohol use, or his home life. She asserted, "I had actually tried to contact [Hannon's counsel] on more than one occasion and he absolutely refused to listen to what I had to say or contribute. He did not want to talk to me at all. I never had a phone call returned." She was also listed as a witness for the penalty phase by Hannon's attorney but was never called during the penalty phase. Hannon's attorney erroneously had her listed as living in a different state even though she lived in Florida. She stated at the evidentiary hearing, "[Hannon's counsel] told me I had nothing to contribute and he didn't need me for anything."

Id. at 1158-62 (emphasis added).

As to the available mental mitigation that Hannon's counsel failed to present, Justice Anstead explained that defense counsel, because of his failure to investigate, lacked knowledge of significant information pertaining to Hannon:

[Counsel] did not know that Hannon began using drugs and alcohol at age eleven and had a history of using LSD on a regular basis at the age of fifteen, as well as crystal methamphetamine, hallucinogenic mushrooms, and crack cocaine, nor did he know that Hannon was paranoid when under the influence of drugs. He did not question Hannon's parents concerning Hannon's expulsion from school for smoking marijuana. He did not know that Hannon's daily alcohol consumption before the murders was half a case of beer and a fifth of bourbon, and that on the night of the murders, Hannon drank almost two cases of beer. Hannon's sister testified at the evidentiary hearing that Hannon's behavior was irritated and edgy leading up to the murders. He would drink excessively and use cocaine on a daily basis without sleeping at night. He also used acid a couple of times a month.

Id. at 1164 (footnote omitted). As to mitigation actually presented at the

postconviction evidentiary hearing, Justice Anstead explained:

> The evidence presented at Hannon's evidentiary hearing
> established that Hannon had a history of severe drug and alcohol
> abuse "to the point of blacking out and passing out," parental neglect,
> and neurological impairments resulting in poor impulse control and
> flawed decision-making. Drs. Crown and Sulton testified that
> Hannon's impairments impacted his daily functioning. Dr. Crown,
> board certified in neuropsychology, stated that Hannon was "having
> difficulty with cognitive processing" and that there was evidence of
> "head trauma from accidents, from being kicked, from falls." He also
> testified,
>
>> In terms of drug [e]ffects the greatest exposure to drugs
>> and the greatest absorption level is in the fronto temporal
>> area and actually the subcortical area relating to the
>> limbic system. And these are areas that are responsible
>> for concentration, attention, control of impulsivity,
>> understanding the long-term consequences of immediate
>> behavior and processing immediate memory, and also it
>> aids in restoring memory function.
>
> Dr. Crown also noted that Hannon suffered from rheumatic fever at
> age seven; its impact on his health was severe and he missed months
> of schooling. Hannon also suffered various head injuries, including
> losing consciousness at football practice in the ninth grade, getting
> kicked in the head by a bull, being hit by scaffolding at work, and
> being involved in several car accidents. "[R]apidly retrieving . . .
> information and applying it in a new situation is extremely difficult
> for him, and that's where he falls apart." Hannon was distracted very
> easily and has "difficulties under stress, pressure, drugs, lack of sleep,
> in fully comprehending information and attending to tasks."
> Drs. Crown and Sulton both performed the Wechsler Adult
> Intelligence Scale Revised, which resulted in a very low score on the
> subtest that is most indicative of brain damage. Also, Hannon told Dr.
> Sulton that he had gone AWOL from the military on three separate
> occasions. Dr. Sulton found several nonstatutory mitigators such as
> parental neglect, lack of structure, lack of discipline, lack of guidance

in his childhood environment, and serious childhood illnesses. Dr. Sulton also termed him an "extreme follower" and found that Hannon had severe and chronic substance abuse problems, was impulsive, lacked concentration, and had personality changes due to his cocaine addiction. His score of global intelligence was average, but he scored an 8 out of 100 on the "digit symbol subtest" relating to "the rate of speed with which he is capable of learning symbol relationships," which could indicate a learning disability. Dr. Lipman, a neuropharmacologist, stated that Hannon would combine "smoking, drinking, taking acid and Quaaludes" as a teenager and this could have had a long-term effect on his brain, even before he moved on to crystal meth and cocaine. Even the State's witness, Dr. Sidney Merin, agreed that Hannon had "a polysubstance abuse disorder." Therefore, if he had performed an investigation, Hannon's counsel could have presented substantial and persuasive testimony concerning Hannon's mental health to establish a case of mitigation.

Id. at 1166 (footnote omitted).

Determining that the lack of mitigation entitled Hannon to a new penalty phase, Justice Anstead concluded:

No material mitigation was supplied to the jury in Hannon's penalty phase; instead Hannon's counsel chose to continue arguing innocence, an argument the jury had emphatically already rejected. Hence, in the face of this default by counsel, the jury was left with no choice but to impose the death penalty. Absolutely no mitigation was presented on behalf of Hannon, thereby resulting in a breakdown of our adversarial system as discussed by the Supreme Court in Strickland [v. Washington, 466 U.S. 668 (1984),] and Wiggins [v. Smith, 539 U.S. 510 (2003),] and which resulted in the defendant being deprived of a reliable penalty-phase proceeding.

Having demonstrated both deficient performance and prejudice at the evidentiary hearing below, Hannon should be entitled to a new sentencing proceeding in which he will be represented by competent counsel prepared to contest the State's case for the death penalty by presenting the voluminous evidence of mitigation presented at the postconviction hearing.

Id. at 1169-70. Although the majority in 2006 relied on Hannon's family's involvement in choosing to waive mitigation as a strategy, it is axiomatic that defendants, such as Hannon in this case, cannot intelligently waive mitigation unless counsel performs a proper investigation. See id. at 1160-61; see also Wiggins, 539 U.S. at 526; State v. Pearce, 994 So. 2d 1094, 1102 (Fla. 2008).

In addressing the appeals before us, it is difficult to ignore the testimony that could have been presented if Hannon's counsel had properly conducted a mitigation investigation. The United States Supreme Court made clear in Wiggins that mitigation significantly affects a jury's sentencing determination, stating: "We further find that had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." 539 U.S. at 536. Thus, Hannon's counsel's failure regarding mitigation is even more disturbing in light of Hurst.

As I explained in Kaczmar:

Under Hurst, this Court cannot substitute its judgment for that of the jury and, therefore, cannot determine what weight the additional mitigation would have been assigned if it had been presented to the penalty phase jury. Nor can we speculate on the effect that the additional mitigation, if presented to the jury, would have had on the jury's recommendation in [the] penalty phase.

42 Fla. L. Weekly S127, 2017 WL 410214, at *11 (Pariente, J., concurring in part and dissenting in part). Further, in Robards v. State, 214 So. 3d 568 (Fla. 2017), I emphasized the constitutional ramifications of "woeful[ly] inadequa[te] . . . penalty

phase counsel." Id. at 576 (Pariente, J., concurring). As in Robards, the jury in Hannon's case "was not presented with the full picture of [his] life when it made its recommendations." Id. at 576-77.

Exacerbating counsel's failure to present mitigation, which left the jury with "no choice" but to recommend death at the penalty phase, Hannon II, 941 So. 2d at 1169 (Anstead, J., dissenting), Hannon's codefendant, Acker, was given a life sentence for his role in the crimes after this Court affirmed Hannon's convictions and sentences on direct appeal. Id. at 1144 (per curiam). Denying Hannon's newly discovered evidence claim on postconviction, this Court relied on its conclusion on direct appeal—before Acker was retried—that Hannon was the "most culpable" of the two codefendants. Id. at 1145. However, as pointed out in Justice Anstead's dissenting opinion, at Hannon's postconviction evidentiary hearing "Dr. Sulton also termed [Hannon] an 'extreme follower' and found that Hannon had severe and chronic substance abuse problems, was impulsive, lacked concentration, and had personality changes due to his cocaine addiction." Id. at 1169-70. (Anstead, J., dissenting).

Hannon raised the issue of proportionality in his third successive postconviction motion and argues on appeal to this Court that his sentence violates the Eighth Amendment based on proportionality. Further, although not discussed in this Court's opinion on direct appeal, it was Hannon's codefendant who had the

motivation to kill the targeted victim, who had vandalized the codefendant's sister's apartment a week before. See Hannon I, 638 So. 2d at 43.

The Court explained on direct appeal that "[t]he motive was the conflict between [the victim] and Jim Acker's sister." Id. at 44. Likewise, Hannon states in his brief to this Court that "Acker was the instigator and had the only motive." Initial Br. of Appellant, Hannon v. State, No. SC17-1837 (Oct. 18, 2017), at 83. Hannon alleges that "Acker was equally responsible for [the victim's] cause of death, multiple stabbing wounds, where no single wound was singled out as being fatal but rather were all lethal." Id. Hannon cites to the medical examiner's testimony in both Hannon's and Acker's trials, stating that any one of the stab wounds inflicted by Acker on the victim would have been fatal. Id. at 71. Thus, it would appear that Acker had the motive to murder the victim and played a substantial role in the murder.

Of course, had this Court granted Hannon a new penalty phase in 2006, as Justice Anstead advocated,[9] Hannon would now have the benefit of the retroactive application of Hurst and would be entitled to a new penalty phase in light of Hurst

---

9. I recognize that the United States Court of Appeals for the Eleventh Circuit also denied relief on Hannon's claim that "counsel's performance was inadequate during the penalty phase of his trial," finding that our opinion was not "objectively unreasonable." Hannon v. Sec'y, Dep't of Corr., 562 F.3d 1146, 1148 (11th Cir. 2009). However, the federal standard for granting relief on a claim that the state courts denied is extremely narrow.

if the jury had not unanimously recommended death on resentencing. See Mosley v. State, 209 So. 3d 1248, 1283 (Fla. 2016). While reaching this conclusion may require a lot of "ifs," Hannon's case demonstrates to me the inherent arbitrariness of the imposition of the death penalty as to who lives and who dies, even among codefendants.

Hannon explains this arbitrariness in his Response to this Court's Order to Show Cause, pointing to various defendants who were convicted of older homicides and received the benefits of Hurst because they were granted resentencing. Response to Order to Show Cause, Hannon v. State, No. SC17-1618 (Oct. 12, 2017), at 12-17. And, as I stated in my concurring in part, dissenting in part opinion in Asay v. State (Asay V), 210 So. 3d 1, 32-37 (Fla. 2016), cert. denied, No. 16-9033, 2017 WL 1807588 (U.S. Aug. 24, 2017):

> The majority's conclusion results in an unintended arbitrariness as to who receives relief depending on when the defendant was sentenced or, in some cases, resentenced. For example, many defendants whose crimes were committed before 2002 will receive the benefit of Hurst because they were previously granted a resentencing on other grounds and their newest death sentence was not final when Ring was decided. To avoid such arbitrariness and to ensure uniformity and fundamental fairness in Florida's capital sentencing, our opinion in Hurst should be applied retroactively to all death sentences.

Id. at 36 (Pariente, J., concurring in part and dissenting in part) (footnote omitted).

Hannon's case demonstrates this arbitrariness.

Finally, Hannon raised claims based on <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985), in his initial postconviction motion and again after <u>Hurst</u> in his response to this Court's Order to Show Cause at issue in this case. <u>Hannon II</u>, 941 So. 2d at 1117, n.2; Response to Order to Show Cause, <u>supra</u>, at 11. He also raised this issue in his Renewed Motion to Stay Execution, noting Justice Sotomayor's recent dissenting opinion in <u>Truehill v. Florida</u>, Nos. 16-9448, 17-5083, 2017 WL 2463876 (U.S. Oct. 16, 2017), joined by Justices Ginsburg and Breyer. Per curiam op. at 16. Thus, Hannon has raised a valid <u>Caldwell</u> claim both before and after <u>Hurst v. Florida</u>, 136 S. Ct. 616 (2016), and <u>Hurst</u>.

On the merits, I believe that the <u>Caldwell</u> claim further strengthens Hannon's Eighth Amendment argument. Hannon's Response to this Court's Order to Show Cause explains the flaw in the jury instructions used in his pre-<u>Hurst</u> penalty phase that diminish the jury's sense of responsibility:

> If a bias in favor of a death recommendation increases when the jury's sense of responsibility is diminished, removing the basis for that bias increases the likelihood that one or more jurors will vote for a life sentence. Here, the record in Mr. Hannon's case supports that presumption where his jury received inaccurate instructions as to their ultimate responsibility during sentencing and as to their power and to dispense mercy and preclude a death sentence. . . . This [Court's holding in <u>Hurst</u>] is particularly relevant in Mr. Hannon's case where he has argued during his postconviction appeals that the jury was not instructed it could exercise mercy and residual doubt was the only argument trial counsel advanced to the jury during [the] penalty phase.

Response to Order to Show Cause, <u>supra</u>, at 22-23. Thus, this claim further

- 27 -

supports the conclusion I explained above—that the jury in Hannon's case was not properly informed or instructed to determine, as constitutionally required by <u>Hurst</u>, that Hannon is deserving of the ultimate punishment because he committed murders that are among "the most aggravated and least mitigated." <u>Hurst</u>, 202 So. 3d at 60.

## CONCLUSION

In recommending between life and death in Hannon's case, the jury was denied access to "voluminous evidence of mitigation." <u>Hannon II</u>, 941 So. 2d at 1169 (Anstead, J., dissenting). Also, Hannon's codefendant, who had personal motivation to commit the crime and first attacked the targeted victim, received a life sentence of which this Court was unaware when it affirmed Hannon's sentences on direct appeal. For all these reasons, I dissent from denying Hannon relief from his pending death warrant.

An Appeal from the Circuit Court in and for Hillsborough County,
    Michelle Sisco, Judge - Case No. 291991CF001927000AHC

Neal Dupree, Capital Collateral Regional Counsel, Suzanne Myers Keffer, Chief Assistant, and Scott Gavin, Staff Attorney, Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, Timothy A. Freeland, Senior Assistant Attorney General, and Marilyn Muir Beccue, Assistant Attorney General, Tampa, Florida,

    for Appellee